## UNITED STATES *v.* SWIFT & COMPANY.

## SWIFT & COMPANY *v.* UNITED STATES.

APPEALS FROM THE COURT OF CLAIMS

Nos. 288 and 289. Submitted November 24, 1925.—Decided March 1, 1926.

1. A finding by the Court of Claims that a general who signed a contract for army supplies was the representative of the Quartermaster's Department in that regard, *held* conclusive on this Court as a finding of fact, or of mixed law and fact, where the result involved consideration of apparent conflicts of jurisdiction of many food supply agencies during the war, and of orders from the War Department and Quartermaster's Department, the effect of which was limited in practice, all of which were before the Court of Claims. P. 137.

2. Orders for the purchase of bacon for the Army, accepted by the seller and signed by the proper representatives of the Quartermaster's Department and the Food Administration, *held* authorized in writing on behalf of the Government. P. 138.

3. The authority of the representative of the Packing House Products Branch of the Subsistence Division of the Quartermaster General's Office, at Chicago, to purchase meat products for the Army, which was repeatedly exercised and recognized, was not affected by the assignment of another officer as the purchasing and contracting officer for the Packing House Products and Produce Division of the office of the Depot Quartermaster at Chicago or his subsequent transfer to Director of Purchase and Storage. P. 138.

4. Acceptance of an offer in part becomes a contract when the offerer accepts the modification. P. 139.

5. It is not essential to a contract of sale that it fix a price. P. 139.

6. An agreement reached by correspondence between a meat packer and representatives of the Quartermaster's Department and the Food Administration for the delivery of bacon in three successive

months, a specified quantity in each, *held* a contract of the Government to take the total quantity, and not preliminary negotiations, although the amounts for the first two months were subsequently covered by more formal·contracts fixing the price, which could not be done in advance. P. 141.

7. Under the Act of March 4, 1915, providing that a contract not to be performed within sixty days and exceeding $500 in amount, where made by the Quartermaster General or by officers of the Quartermaster Corps, shall be reduced to writing and signed by the contracting parties, a contract with the Quartermaster's Department may be made by an exchange of correspondence, properly signed, and need not be in one instrument signed by both parties at the end thereof. Rev. Stats. § 3744, if to be construed otherwise, is modified by the later enactment. P. 142.

8. The fact that a government contract was signed in the name of the contracting officer by a subordinate does not render it invalid, where such execution accorded with the practice of the office and was authorized, and the binding effect·of the contract recognized, by the contracting officer. . P. 144.

9. In the absence of a market value standard, a vendor of goods which the Government declines to accept under its contract, is entitled. to the difference between the contract price and the amount realized by the vendor through resale made in good faith with diligent effort.· P. 148.

10. The fact that the vendor shipped part of the goods to Europe and resold them there, *held* no reason for denying recovery according to this rule, good faith being evident, with nothing to· show that a better price could have been realized elsewhere. P. 149.

59 Ct. Cls. 364, affirmed with modification.

CROSS appeals from a judgment of the Court of Claims allowing recovery of damages resulting from the Government's refusal to take goods under its contract, but limiting this to the part resold by the claimant in this country, and refusing relief as to the part which it resold abroad.

*Solicitor General Mitchell, Assistant to the Attorney General Donovan,* and *Messrs. Abram F. Myers* and *Rush H. Williamson,* Special Assistants to the Attorney General, were on the brief, for the United States.

*Mr. G. Carroll Todd* submitted for Swift & Co. *Messrs. Albert H. Veeder, Henry Veeder, R. C. McManus, Connor B. Shaw* and *P. L. Holden* were also on the brief.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is a suit to recover damages for the loss caused to Swift & Company by the refusal of the United States to accept a quantity of finished and unfinished army bacon ordered by competent authority for delivery in March, 1919. The only ground for not accepting it was that the need had been removed by the unexpected rapidity of demobilization. The claim was first presented to the War Department under the Act of March 2, 1919, 40 Stat. 1272, known as the Dent Act. It was denied by the Board of Contract Adjustment of the War Department, on the ground that the agreement under which the bacon was produced was not concluded until after November 12, 1918, the Dent Act applying only to agreements entered into prior to that date. The Secretary of War affirmed this decision. The petition in the Court of Claims alleged that the liability of the Government was lawfully established by a written contract properly signed and executed, binding the United States.

The Court of Claims found that the contract was entered into in due and regular form and could be enforced under the general jurisdiction of the Court of Claims, and that, even if there were defects in the contract, as the contract had been fully performed in accord with the terms of the contract as subsequently modified by the parties, the alleged defects were immaterial. It accordingly gave judgment for $1,077,386.30, being the difference between the contract price for the bacon ready for delivery in accordance with the contract and the proceeds of its sale. In addition to this amount, Swift & Company sought damages in the amount of $212,216.69 for more

than one million pounds of salted bellies which had been cured but had not been smoked and made into bacon, and which were on hand at the time the contract was cancelled. A large part of these were sold in France at a very large reduction. The Court of Claims held that by attempting to sell this material abroad, Swift & Company had taken a speculative course and could not hold the Government for the difference between the contract price and the proceeds of sale. Swift & Company filed a cross appeal on this issue, and that is before us.

The Government in the Court of Claims set up a counter-claim against Swift & Company for $1,571,882, made up of alleged improper and illegal charges presented by the plaintiff to the defendant on account of army bacon delivered from September, 1918, to February, 1919, which were paid by the Government by mistake to Swift & Company in the settlement of bills and accounts so presented. The Court of Claims found that it was not shown to the satisfaction of the court that any improper or illegal charges had been made or paid by mistake, or that any misrepresentation or concealment was practiced by Swift & Company, to the detriment of the Government in the settlement. The Government appealed from this rejection of the counter-claim, but does not press its appeal.

The correspondence upon which Swift & Company asserts the existence of a valid contract in writing between the parties is contained in the sixteenth finding of the Court of Claims:

## "XVI.

"On November 9, 1918, a conference was held on the call of General Kniskern at which he and Major Skiles, for the Government, were present and representatives of the seven large packers, including Swift & Co., for the purpose of providing allotments of bacon and other meat products for the months of January, February, and March, 1919. The quantity of bacon asked for for the

three months stated was 60,000,000 pounds, 30,000,000 pounds each of Serials 8 and 10.

"On November 12, 1918, Swift & Co. sent to the general depot of the Quartermaster Corps at Chicago the following communication:

> " ' Swift & Company,
> Union Stock Yards,
> *Chicago, November 12, 1918.*

" ' War Department,
> *General Depot of the Quartermaster Corps,*
> *1819 West 39th Street, Chicago, Illinois.*

" ' Gentlemen: (Attention Maj. Skiles).

" ' Referring meeting in your office Saturday, November 9th, please be advised we offer for delivery during January, February, and March, 1919:

17,500,000 lbs. serial 10 bacon and
4,000,000 lbs. serial 8 bacon.

_____

21,500,000 lbs.

" ' We offer for delivery each month as shown under:

|          | Serial # 10 | Serial # 8 |
|----------|-------------|------------|
| January, | 6,000,000   | 1,400,000  |
| February,| 5,500,000   | 1,200,000  |
| March,   | 6,000,000   | 1,400,000  |
| Total,   | 17,500,000  | 4,000,000  |

" ' You will note we are offering a larger proportion of serial #10 than of serial #8 bacon. This because we have gone to great expense in equipping canning rooms at Chicago, Kansas City, and Boston on the understanding that you very much preferred serial #10 bacon to serial #8. The amount serial 10 given above is the minimum amount required to enable us to operate our canning rooms at fair capacity. If necessary we are willing to have our offers Serial 8 bacon increased and serial 10 decreased proportionately to the extent you find necessary

bearing in mind that we will appreciate as liberal a proportion of serial #10 bacon as possible.

" ' Will you kindly advise if we shall figure to put down above amounts for delivery as shown. After receipt of such advice we will furnish you with statement of amounts we will put in cure at each plant.

" ' Yours respectfully,

" ' Swift & Company,

" ' Per GES, Jr.

" ' Prov. Dept. JH-JL.

" ' United States Food Administration License No. G-09753.'

" On November 26, 1918, the following communication was sent to the Chicago office of the Food Administration for the attention of Major Roy:

" ' (War Department, office of the Quartermaster General, Packing House Products Branch, Subsistence Division, 1819 West 39th Street, Chicago, Ill.)

" ' Subsistence.

" ' 431 P & S-PC.

" ' November 26, 1918.

" ' From: Officer in charge, Packing House Products Branch, Subsistence Division, office Director of Purchase and Storage.

" ' To: United States Food Administration 757 Conway Bldg., Chicago, Ill. Attention Major E. L. Roy.

" ' Subject: Allotments—Bacon and canned meats.

" ' 1. In connection with the requirements of this office— canned meats and bacon—for the months of January, February, and March, 1919, you are requested, please, to make allotments to the various packers of the items in the quantities and for delivery as is indicated below:

" ' Swift & Company, serial 10 bacon, January, 6,000,-000 lbs.

" ' Swift & Company, serial 10 bacon, February, 5,500,-000 lbs.

" ' Swift & Company, serial 10 bacon, March, 6,000,000 lbs.'

(There follows names of 17 other packers followed by stated amounts of different products for each of the three months.)

" ' 2. It is requested that packers be informed at the earliest practical date allotments made to them, in order, (*sic*), that they can make necessary arrangements for the procurement of tins, boxes, and other equipment, as well as to know the quantities of green product it will be necessary for them to put in cure during December to apply on later deliveries.

" ' 3. Please send copy of the official allotments to this office for our records.

" ' By authority of the Director of Purchase and Storage:
" 'A. D. Kniskern,
"*Brigadier General, Q. M. Corps, in Charge.*
" ' By O. W. Menge,
" ' *2nd Lieut., Q. M. Corps.*' "

" ' OWM: JDW.'

" On December 3, 1918, the Food Administration, by Major Roy, with the approval of the chief of the Meat Division, whose assistant he was, issued the following:
" ' Dec. 3.
" 'D. C. P. #8.   2187.

" ' From: U. S. Food Administration, Meat Division, Swift & Company.

" ' To: U. S. Yards, Chicago, Ill.

" ' Subject:

" ' 1. On requisition of the Packing House Products Branch, Subsistence Division, office of Quartermaster General, 1819 W. 39th Street, Chicago, Ill., you have been allotted for delivery during the month of—

| Product | Quantity | Price |
|---|---|---|
| January, 1919, bacon serial #10; | 6,000,000 lbs. | To be determined |
| February, 1919, bacon serial #10; | 5,500,000 lbs. | later |
| March, 1919, bacon serial #10; | 6,000,000 lbs. | |

" ' 2. The above to be in accordance with Q. M. C. Form 120 and amendments thereto.

" ' 3. For any further information regarding this allotment apply to the Packing House Products Branch, Subsistence Division, office of the Quartermaster General, 1819 W. 39th St., Chicago, Ill.

" ' United States Food Administration,

" ' Meat Division,

" ' By E. L. Roy.'

"Major E. L. Roy, Quartermaster Corps, National Army, then a captain, was by orders of the Chief of Staff, dated July 22, 1918, directed to proceed to Chicago and report to the depot quartermaster for assignment to temporary duty with the Food Administration. He became assistant to the chief of the Meat Division of the Food Administration in charge of the Chicago office of that division and remained with the Food Administration in that capacity until his resignation on December 10, 1918, following his discharge from the Army.

"Two copies of this notice were sent to Swift & Co. on one of which was stamped the words ' Accepted,' followed by this instruction: 'To be signed and returned to Meat Division, 11 W. Washington St., Chicago.'

" Swift & Co. indicated its acceptance by writing below the word 'Accepted' the following: 'Swift & Company, By G. E. S. Jr., 12/11/18', and returned this copy to the Food Administration. The price was left for later determination because of the possible fluctuation in the basic price, that is the price of hogs.

"A copy of this notice was sent to the packing-house products branch of the subsistence division, office of Director of Purchase and Storage, at Chicago, and on December 10, 1918, the following communication was sent to Swift & Co.:

" ' (War Department, office of the Quartermaster General, Packing House Products Branch, Subsistence Division, 1819 West 39th Street, Chicago, Ill.)

" ' December 10, 1918.

" 'Address reply to Depot Quartermaster. Marked for attention Div. 1-1-b, and refer to File No. 431.5 P & S— PC.

" ' From: Officer in charge Packing House Products Br., Subsistence Div., office Director of Purchase and Storage.

" ' To: Swift & Co., Union Stock Yards, Chicago, Ill.

" ' Subject: Bacon Serial 10, January, February, and March.

" ' 1. In connection with the offers you made to this office on bacon, serial 10, for delivery during the months of January, February and March, you will please find indicated below the schedules of deliveries this office requests you to make:

| | |
|---|---|
| January, | 6,000,000 lbs. |
| February, | 5,500,000 lbs. |
| March, | 6,000,000 lbs. |

" ' 2. In order that proper arrangements can be made and all concerned informed accordingly, you are further requested to advise this office by return mail where you contemplate putting up these allotments.

" ' By authority of the Director of Purchase and Storage.

" 'A. D. Kniskern,
" 'Brigadier General, Q. M. Corps,
Officer in Charge.
" ' By O. W. Menge,
2nd Lieut., Q. M. Corps.'

" ' OWM: MJB.' "

" Serial No. 10 bacon was prepared according to Army specification which was packed in cans, the cans being then packed in boxes. Serial No. 8 differed in that it was packed in boxes but not canned."

Upon receiving these orders, Swift & Company directed its buyers to buy hogs. From that time on purchases were conducted daily so that suitable bellies were pre-

pared for January and February deliveries, and on January 13, 1919, the first bellies were put in cure for March, 1919, delivery.

The objections by the Government to the documents submitted on behalf of Swift & Company as written evidence of a contract, are, first, that Government officers conducting the correspondence had no authority to make it; second, that the documents do not contain the necessary terms to constitute a contract, in that they do not show the place for the performance of the contract, and do not fix the price of the bacon to be delivered; third, they do not show a real agreement between the parties, but were merely preliminary negotiations and were never merged in a written contract; and, fourth, that they do not comply with Revised Statutes, § 3744, in the form of contract required in such cases.

First. The officers whose names are attached to the papers on behalf of the Government are Brigadier General A. D. Kniskern, Quartermaster Corps, and Major E. L. Roy, Quartermaster Corps, assigned to temporary duty with the Food Administration.

The finding of the Court of Claims in respect of General Kniskern's authority is as follows:

" The furnishing of adequate meat supplies for the Army was within the authority and duty of the Acting Quartermaster General and afterwards within his authority and duty as Director of Purchase and Storage. General Kniskern, as depot quartermaster at Chicago, was the authorized representative of the Acting Quartermaster General in the purchase of meat supplies and, while subject to any specific instructions which the Acting Quartermaster General might see fit to give him, his duty was to supply the needs, and specific authority as to each purchase was not required. There was in the office of the Quartermaster General a subsistence division, but the chief duty it exercised in the matter of the purchase of meats was to

supply General Kniskern with such information as might be available as to future needs, leaving it to him to supply them. The authority of General Kniskern in connection with the establishing in Chicago of a packing house products branch of the subsistence division of the Quartermaster General's Office and in connection with his later appointment as zone supply officer appears in Findings V and VI.

" V.

"On July 3, 1918, by Office Order No. 419, Quartermaster General's Office, there was established in Chicago a packing-house products branch of the subsistence division of the Quartermaster General's Office to be located in the general supply depot of the Quartermaster Corps at Chicago, to be under the immediate direction and control of the depot quartermaster, and to be responsible for all matters pertaining to the procurement, production, and inspection of packing-house products, subject to the control of the Quartermaster General.

" The interpretation of this order by the then Acting Quartermaster General was, ' that whereas the purchasing of supplies was concentrated in Washington, that Chicago being the food market, we delegated to General Kniskern the purchase of meat products and articles of that kind.'

" VI.

"On October 28, 1918, by Purchase and Storage Notice No. 21, issued by Brig. Gen. R. E. Wood, as Director of Purchase and Storage, supply zones were created and by said order the Director of Purchase and Storage appointed ' as his representative in each general procurement zone the present depot quartermaster to act and be known as the zone supply officer,' who was ' charged with authority over and responsibility for supply activities within the zone under his jurisdiction.'

" This form of organization in effect transferred the field organization of the Quartermaster Corps to the office of the Director of Purchase and Storage. The procurement divisions which had theretofore existed in the Quartermaster Corps were transferred to the supply zones created in the purchase and storage organization, these zones being practically the same as those formerly existing in the Quartermaster Corps, over each of which the proper depot quartermaster exercised jurisdiction, and the depot quartermasters of 'the Quartermaster Corps became zone supply officers and representatives, as such, of the Director of Purchase and Storage.

" Existing orders and regulations of the several supply corps with respect to supply activities transferred to the Director of Purchase and Storage were continued in effect, ' providing that the zone supply officers constituted by the notice shall have final authority in their respective zones over all matters referred to in existing orders and regulations.' "

The Food Administration under the President, early in 1918, found that the demand for food commodities was greater than their supply, and it was necessary to suspend the law of supply and demand in respect of their prices, and that large purchases of certain commodities should be made by allocations at fair prices. A Food Purchase Board was formally organized by the President, which, on July 16, 1918, required that canned meats and bacon should be placed on an allotment basis. General Kniskern, as depot quartermaster at Chicago, was notified by the Quartermaster General that thereafter tin bacon and smoked bacon would be allocated by the Food Administration and he was requested to cancel orders which had been placed with the packers and ask allotments of the same from the Food Administration. He accordingly in August 1918 cancelled the orders for the next four months, but wrote the Food Administration requesting that they

confirm the allotments made in accordance with his orders. Thereupon Major Roy of the Quartermaster's Department, in the name of the Food Administration, made the allotments. This arrangement continued until the Food Administration gave up its activities, after the Armistice.

On December 16, 1918, General Kniskern was instructed by telegraph as follows:

"December 16, 1918.

"Effective with January requirements, the Army will purchase packing-house products independently of Food Administration.

"This office is notifying Food Administration accordingly. You are authorized to proceed on this basis. Please wire acknowledgment.

"Wood, *Subsistence*, Baker."

Thereafter prices for January and February deliveries were determined as they had been during the early months of 1918 before that function came to be exercised by the Food Administration. The course of procedure with reference to giving the orders for bacon and the fixing of the price therefor is shown in the following Finding:

"IX.

"In supplying the needs of the Army for bacon and other packing house products during the early stages of the war, the regular method of advertising for and receiving bids and letting contracts to lowest bidders, if otherwise satisfactory, was adhered to, but later on, in 1917 and during 1918, the needs had so grown and were so rapidly approaching the capacity of the packing plants that this method became impracticable, and the necessity for a constant and ever-increasing flow of supplies of this character made necessary the resort to other purchase and procurement methods.

"The office of the depot quartermaster, afterward the zone supply officer, at Chicago was informed from time to time by the proper authorities at Washington as to the number of men which would be in the service within stated times, and the duty devolved on the depot quartermaster of procuring supplies of the kind in question sufficient for the indicated number of men without the issuance of specific authorization to him in each instance to purchase or specific instructions as to quantities to be purchased. And because of the time required to cure, smoke and can Army bacon, it was necessary to anticipate needs therefor.

" The plan was adopted by the depot quartermaster at Chicago of calling into conference with him or his authorized assistant, from time to time, representatives of this plaintiff and the six other large packing houses, at which conferences the packers' representatives were informed as to the needs of the Government for a stated period, usually three months, sufficiently in the future to give time for manufacture, and asked to indicate what portion of the stated needs each would furnish. Upon receipt of the statements from the packers as to what quantities they would furnish, which were submitted in writing and usually within a few days after the conference, the depot quartermaster made an allotment to each packer and notified each as to the quantities it would be expected to furnish during each month of the period involved."

It is quite evident from the findings that in the organization and reorganization of the many agencies needed to furnish the supplies of food in Chicago, there were apparent conflicts of jurisdiction and there were orders issued having on their face general application which in fact by the course of business were limited, and all these orders from the War Department and from the Quartermaster's Department were before the Court of Claims for its consideration. In such a situation the finding of the

Court of Claims that General Kniskern was the representative of the Quartermaster's Department in making these contracts for bacon is either a question of fact or a mixed question of law and fact, and is conclusive on this Court. *United States* v. *Omaha Tribe of Indians,* 253 U. S. 275, 281; *Ross* v. *Day,* 232 U. S. 110, 116, 117, and cases cited. There is nothing whatever in the other findings which is inconsistent with this. At the time this order was given and accepted by Swift & Company in November, 1918, the Food Administration, by direction of the President, had the authority and duty to act upon the needs of the Quartermaster General's Department for bacon and other food supplies and to approve those orders and allot them to the packing companies who were to deliver the supplies. When, therefore, the accepted orders had been signed both by General Kniskern and by Major Roy for the Food Administration, they were certainly authorized in writing on behalf of the Government.

. General Kniskern's authority to act in these purchases is questioned on the ground that a Captain Shugert was the only officer authorized to make such contracts. The objection can not be sustained. On September 17, 1918, Capt. Jay C. Shugert, Quartermaster Corps, was, by authority of the Acting Quartermaster General, designated as purchasing and contracting officer for the packing house products and produce division of the office of the depot quartermaster at Chicago. This order to Shugert did not vest him with any authority to make contracts for the packing products branch of the subsistence division of the Quartermaster General's office. Before this latter branch was established, there was a packing house products and produce division of the depot quartermaster's office at Chicago to which Shugert was attached. These two offices were distinct. The former was a unit of the Quartermaster General's office located at Chicago under the immediate direction and control of

the depot quartermaster, with general authority to purchase packing house products for the whole army of the United States wherever situated, as shown by the findings. The latter was a unit in the depot quartermaster's office at Chicago, and by an order of January 9, 1919, its functions were transferred to a newly organized office of Director of Purchase and Storage, and Captain Shugert was transferred with it and thereafter signed the so-called formal contracts of January and February. More than this, even if Captain Shugert had been a purchasing and contracting officer with authority to sign this main contract of November, 1918, it would not have deprived General Kniskern of such power when his authority had been recognized and exercised in the purchase of many millions of pounds of bacon for the Government for many months.

Second.   The next objection is that the alleged contract is not complete in its terms, first, in that the offers made by Swift & Company included No. 8 bacon, while the order of the Food Administration and of General Kniskern included nothing but No. 10 bacon.   We find no weight in this suggestion.   The offer was made by Swift & Company, and it was only accepted by the allotment of the Food Administration to the extent of No. 10 bacon and that allotment was accepted in writing by Swift & Company, which, of course, eliminated bacon No. 8 from the contract.

Then it is said that in the letter of December 10th an inquiry was made by General Kniskern for information as to where the allotments were to be put up. This was not a term of the contract. It was evidently left to the discretion of Swift & Company to distribute the allotments as might be convenient to it, and the inquiry was only for information as to the various plants of Swift & Company at which inspections and deliveries were to be made.

Then it is said that there was no complete contract because the price was not fixed.   Upon this point Finding

No. 10 of the Court of Claims is important. It is as
follows:

" Since there were many elements entering into cost of
production as to which there were frequent fluctuations,
it was not practicable to undertake to determine prices
so far in advance, and accordingly, instead of fixing prices
at the time the proposals were submitted, or notices of
allotments issued, it was agreed that prices would be de-
termined at or near the first of each month for the product
to be furnished during that month. This was at a time
when of necessity the preparation of the product, in this
instance bacon, was well under way, approaching comple-
tion as to a large part thereof and when the cost of the
green bellies, the basic element of final cost, and other
fluctuating elements of cost were ascertainable.

"At about this time the usual form of circular proposals
were sent to the packers, not for use in submitting bids as
under the peacetime competitive system, but as a con-
venient method for formal submission by the packers of
their proposals as to price for the product which they had
theretofore been directed to furnish during the month in
question and which already, by direction of the depot
quartermaster, was in process of preparation.

" Upon submission of these proposals as to price, if the
same were satisfactory to the depot quartermaster or,
otherwise, upon adjustment to a satisfactory basis, pur-
chase orders were issued, which furnished the basis of
payment, although the purchase orders frequently were
not issued until a part and sometimes all of the product
covered thereby had been delivered."

It was evidently impossible to make a contract fixing
the price of the bacon in advance of the partial perform-
ance of it, and the price was therefore left to subsequent
adjustment. The Food Administration, by its regulations,
had already determined that the profit of the seller should
not exceed 9 per cent. of the investment, or 2½ per cent.

of the gross sales. Under ordinary conditions, a valid agreement can be made for purchase and sale without the fixing of a specific price. In such a case a reasonable price is presumed to have been intended. In the case of *United States* v. *Wilkins,* 6 Wheat. 135, it was held, under a proviso of the contract which left the price to be adjusted by the Government and the contractor, that it was to be the joint act of both parties and not the exclusive act of either, that if they could not agree, then a reasonable compensation was to be allowed, that that reasonable compensation was to be proved by competent evidence and settled by a jury and that the contractor at such a trial was at liberty to show that the sum allowed him by the Secretary of War was not a reasonable compensation. In *United States* v. *Berdan Fire Arms Company,* 156 U. S. 552, 569, a suit in the Court of Claims, it was objected that there was no price agreed upon and that the officers of the Government were not authorized to agree upon a price. It was held that this was not material. The question was whether there was a contract for the use of the patent in that case, and not whether all the conditions of the use were provided for in such contract, that this was the ordinary rule in respect of the purchase of property or labor. 1 Williston, Contracts, § 41. We find, therefore, that, by the writings and documents, all the necessary details making a valid contract were set forth in writing.

Third. Were they more than mere preliminary data upon which a subsequent formal contract was to be framed and signed? Taking the writings together, it is quite evident that as between individuals such writings would constitute a single contract for the delivery of 17,000,000 pounds of No. 10 bacon in monthly installments. As the Court of Claims points out: " From the inception of the contract here involved bacon for January, February, and March deliveries was the matter to which the parties addressed themselves. At the conference of November 9,

the total needs for the three months were made known. The plaintiff's proposal, the Food Administration's allotment, in so far as that is material, and General Kniskern's award all covered the three months. Any separation of the month of March and its treatment as a matter of independent negotiation is, therefore, unauthorized."

The fact that in January and February there were separate formal contracts of purchase of the bacon deliveries for those months signed by Captain Shugert and Swift & Company does not change our view that the original contract was made in November for the three months. These later contracts were not made until much of the bacon had been delivered and the remainder was nearly ready for delivery and after the price could be' determined from the actual cost of purchase of the hogs and the preparation of the bacon. The real function of these so-called formal contracts was to fix the price for the monthly settlements which had been postponed in accordance with the provision of the original contract until it could be fairly determined from the actual cost.

Fourth. We reach the question whether the contract was evidenced in writing as required by the statutes of the United States? Rev. Stats., § 3744, provides that "it shall be the duty of the Secretary of War, of the Secretary of the Navy, and of the Secretary of the Interior to cause and require every contract made by them severally on behalf of the Government, or by their officers under them appointed to make such contracts, to be reduced to writing, and signed by the contracting parties with their names at the end thereof." This has been qualified by a provision of a War Appropriation Act of March 4, 1915, 38 Stat. 1062, 1078, c. 143, reading as follows:

"That hereafter whenever contracts which are not to be performed within sixty days are made on behalf of the Government by the Quartermaster General, or by officers of the Quartermaster Corps authorized to make

them, and are in excess of $500 in amount, such contracts shall be reduced to writing and signed by the contracting parties. In all other cases contracts shall be entered into under such regulations as may be prescribed by the Quartermaster General."

It is first contended on behalf of the Government that. under § 3744, Revised Statutes, the contract must be in one instrument and signed by both parties at the end thereof—that that is the effect of the words "to be signed at the end thereof." This section has been before this Court a number of times, and it has never been clearly declared by this Court to require the contract to be reduced to one instrument. In the case of *South Boston Iron Company* v. *United States,* 118 U. S. 37, the Court of Claims had held that the words " with their names at the end thereof" required that the signatures should be appended to one instrument, but it was not necessary to the decision of the case. On review in this Court, however, the papers relied on were held to be nothing more than preliminary memoranda made by the parties for use in preparing a contract for execution in the form required by law, which was never done. It was said. that the whole matter was abandoned by the Department after the memoranda had been made and that the Iron Company had never performed any of the work which was referred to and had never been called upon to do so.

The section has been under consideration before this Court also in *Clark* v. *United States,* 95 U. S. 539; *St. Louis Hay & Grain Co.* v. *United States,* 191 U. S. 159; *United States* v. *Andrews & Co.,* 207 U. S. 228; *United States* v. *New York & Porto Rico S. S. Co.,* 239 U. S. 88, 92; *Erie Coal & Coke Corporation* v. *United States,* 266 U. S. 518. In no one of these has it been expressly decided that the requirements of § 3744 may not be met by an exchange of correspondence properly signed. But whether the contention by the Government be true or not

as to § 3744, the change in the Appropriation Act of 1915, in which the words "signed by the parties at the end thereof" are omitted, clearly makes unnecessary the evidencing of such contracts with the Quartermaster's Department by reduction to writing and signatures in one instrument. This was a contract made by the Quartermaster's Department and comes exactly within the amendment of 1915, and we see no reason why it does not constitute a binding contract upon the Government under the general jurisdiction of the Court of Claims.

Some suggestion is made that the signature of General Kniskern to the letter of December 10 was by another. The signature was

" By authority of the Director of Purchase and Storage,

A. D. Kniskern,

*Brigadier General, Q. M. Corps,*

*Officer in Charge,*

By O. W. Menge,

*2d Lieut., Q. M. Corps."*

It is evident from subsequent correspondence that General Kniskern recognized this as his signature and as a binding contract. There seems no doubt about the authority of Lieut. Menge to attach his signature or that it was the regular practice in the office. In a similar case the Court of Claims, *Union Twist Drill Co.* v. *United States,* 59 Ct. Cls. 909, held that the affixing of the signature of a contracting officer by another duly authorized created no infirmity in the execution of the contract. A similar conclusion was reached by Attorney General Gregory, 31 A. G. 349, and by Attorney General Wirt, 1 A. G. 670. The conclusion we have come to in respect to the regularity and legality of the contract under the Act of 1915 makes it unnecessary for us to consider the other ground upon which the Court of Claims sustained this recovery, to-wit, full performance.

This brings us to the question of damages. The Government contends that the Court of Claims did not adopt the proper rule in respect to damages. By the letter of January 24, General Kniskern, Zone Supply Officer, notified Swift & Company that the only bacon the Government would take during the month of March, 1919, would be such bacon as was then in process of cure over and above the quantity necessary to take care of the February awards and which had been passed by the inspectors. Swift & Company received this on January 27th, and at once stopped the putting of bacon in cure, but proceeded with the curing, smoking and canning of bacon already in cure. March 5, 1919, General Kniskern notified Swift & Company that it would be necessary to discontinue production on all commodities which were not intended to apply against the February contract. Should Swift & Company have any issue bacon which was now in smoke and which was in excess of the amount required, for the February delivery, it would be accepted. Swift & Company received this notice on March 6th, and completed the smoking and canning of bacon which was already in smoke. When the notice of March 5th was received by Swift & Company, it had already in smoke for March delivery, 4,197,672 pounds. This bacon was put up under government inspection. When the order was received, there also remained in process of cure, not needed for February deliveries, and intended for March delivery, 1,068,538 pounds of bellies. These had been prepared under government inspection. On March 22, Swift & Company notified General Kniskern that at that time it had the bacon practically all packed and ready for delivery. It said, "We are very short of storage room at each of these plants and will appreciate your giving us purchase order and shipping instructions in the very near future." April 24, General Kniskern wrote Swift & Company that his office was tak-

100569°—26——10

ing preliminary steps toward an adjustment for materials on hand to be applied against the March deliveries, which had been cancelled, and requested that a representative of Swift & Company should be present at a conference to be held at his office on April 29, 1919, " in order that you may be fully informed as to what methods should be followed by your firm in submitting your claim." On April 29, he wrote to Swift & Company, enclosing papers " necessary to prepare in order to file a claim for any amount you may consider due from the various packing house commodities allotted you for delivery during March, 1919, and on which you will suffer a loss by reason of cancellation of those orders." And in a note of August 29, 1919, General Kniskern, Zone Supply Officer, wrote as follows to Swift & Company:

" 1. Regarding your claim for the value of bacon prepared by you under allotment given by this office of November 9, 1918, and in view of the fact that this claim is still awaiting action of the Board of Contracts Adjustments in Washington, I desire to state the following:

" . . . it will be impossible for this office to give you positive and definite instructions as to the disposal of any of this product which may at this time be in your possession. It is, however, realized by this office that the product in question is of a perishable nature. Further, it is an important food product. In view of these two facts, it is believed that these products should be disposed of at the earliest possible moment. It will not be possible for the Government to dispose of them until the negotiations are completed and the actual ownership determined by the Government, taking them at the agreed price or turning them over to you on a basis similar to the salvage basis of unfinished material.

" 3. In the judgment of this office, if you are able to dispose of this product by a sale within the limits of the United States, it would be a perfectly proper procedure,

bearing in mind, of course, that having made such sale it will be necessary for you, when the later negotiations are in progress, to be able to convince a negotiating officer that the price you may have received for such part of this product as has been sold was justified by the conditions.

" 4. In order that you may have some basis on which to proceed, in case you decide to attempt a sale of these products, you are informed that this office, under authority from Washington, is now selling, through the parcel post and to individuals, bacon, serial 10, at $4.15 per can, or about 34 7/12 cents per pound.

" 5. Any sales that you may make at the price which is now being charged through the parcels post and to individuals would, in the judgment of this office, be entirely in the interests of the Government."

Thereupon Swift & Company began selling the number 10 bacon it had prepared for March deliveries. It directed its branch houses and agents to sell this at $4.02 a can at wholesale, a price designed to permit the retailer to sell at the Government's price and realize a profit for the handling of approximately one cent per pound. It sent out instructions to its representatives that the Government was selling at $4.15 a can and added that it was desirable, therefore, that no dealer should sell for less than that. Subsequently, and from time to time, the Government reduced its price on army bacon, and the plaintiff followed the Government's price in its sales except that in a few localities it was able to procure a better price by reason of its ability to make prompt delivery which the Government could not do. The lowest price realized was $2.65 per can, or 22 1/12 cents per pound, which was at or near the end of the period covered by these sales. The sale of the bulk of this product, approximately 98½ per cent. thereof, was completed in January, 1920, although there were sales of about 700 cases in February and a few small

sales thereafter, until October, 1920, during which month the last was sold. For this bacon sold at varying prices the plaintiff received $1,062,847.54, and its expenses of sale were $160,982.23.

The Court of Claims found that a fair contract price for the bacon on the basis upon which prices had theretofore been fixed, and the basis upon which it was contemplated by the parties that the price for this bacon would be fixed, was $1,640,146.18; that the cost of the bacon put up by Squire & Company, a subsidiary of Swift & Company, for the account of Swift & Company, was $430,-410.48, and the fair contract price therefor as between the plaintiff and the United States, on the basis above stated as within the contemplation of the parties, was $432,573,-34; that the reasonable profit, if it had been permitted to complete and deliver this, would have been $5,021.90, and that the reasonable additional profit accruing to Swift & Company, if it had been permitted to manufacture and deliver serial number 10 bacon up to 6,000,000 pounds for March delivery, would have been $8,818.30, leaving a balance, after deducting the net proceeds of sale, and certain other small items to be added, of $1,077,386.30.

We think the necessary effect of the Court of Claims findings is that Swift & Company was diligent in disposing of this bacon at the best prices it was possible to secure. There was a very large amount of this particular bacon on the market, and the finding was that it was not particularly salable because specially prepared under army orders to avoid spoiling; that it was not commercial bacon like number 8; that it required more time for preparation and was not adapted to popular consumption because of its more salty flavor.

The Government complains that this army bacon might have been sold at an earlier time during the summer when pork was at a higher figure, and would have brought more money, but there is nothing in the findings to make a

basis for this claim. The uncertainties as to the best method of disposition of such surplus supplies, not needed by reason of demobilization, justified care and deliberation. Swift & Company seemed to be properly anxious not to embarrass the Government by throwing what it had on the market. The large amount of bacon of this peculiar kind which had to be disposed of made its sale a matter of considerable delay. Swift & Company were evidently anxious to conform as nearly as possible to the desires of the Government, and did so. The bacon of this kind had no market price and had to be worked off slowly. Under these conditions, there was no standard by which the usual rule of damages, namely, the difference between the contract price and the market price, could be the measure of Swift & Company's loss through the failure of the Government to receive the bacon. This was a case where the only standard could be the contract price and the amount realized at actual sale by diligent effort. The rule is that where there is no general market or the merchandise is of a peculiar character and not staple, it is necessary that some other criterion be taken than the difference between the agreed price and the general market value. *Fisher Hydraulic Stone & Machinery Company* v. *Warner,* 233 Fed. 527; *Kinkead* v. *Lynch,* 132 Fed. 692; *Leyner Engineering Works* v. *Mohawk Consolidated Leasing Company,* 193 Fed. 745; *Manhattan City, etc. Ry. Co.* v. *General Electric Company,* 226 Fed. 173; *Frederick* v. *American Sugar Refining Company,* 281 Fed. 305; *Barry* v. *Cavanaugh,* 127 Mass. 394; *Dunkirk Colliery Co.* v. *Lever* (C. A.), 9 Ch. Div. 20, 25.

For these reasons, the measure of damages adopted by the Court of Claims for the bacon which had been prepared under the contract and which the Government did not take, was justified.

We come now to the question of the cross appeal of Swift & Company with reference to the bellies which were

sent abroad for sale in April, after the Government had indicated its desire to cancel the orders for March. These bellies had not been made into bacon. Of these, 65,225 pounds was sold in the United States at an average price of $33\frac{1}{16}$ cents per pound. All of the remainder of them were shipped abroad. Those that went to Belgium were sold at 31 cents; to Norway, at 31 cents; to Germany, at 40 cents, and to France, at 16.56 cents. Swift & Company had theretofore, in ordinary course of business, exported similar products in large quantities, and believed that at this time it would find a good market because of the widely reported shortage of food products in Europe. With these exportations Swift & Company had shipped largely of other products on its own account on which it sustained heavy losses. The Court of Claims in its opinion states that it is quite clear that, in seeking a foreign market for this product, plaintiff was acting in perfect good faith, and in accordance with its best judgment, based on former experiences in exporting and information then at hand as to markets to be anticipated abroad. But the court said that it did not think it could relieve itself from the consequences of its error in seeking a foreign market. " It is true that it does not appear that it could have made other sales on the basis of those made in New York; on the contrary, it is rather to be implied that other purchasers were not then available and that the one found would not buy further, but it seems to us that it was the duty of the plaintiff to have relied upon the home market and to have taken such steps that it might show that it had exhausted that market before resort to a foreign one, and that in the absence of such a showing, it assumed the risk of procuring such results as would demonstrate that the course taken had resulted beneficially to the other party."

We do not agree with this conclusion. We do not think seeking a market in France was so different from

attempting a sale in the United States as to indicate a disposition to speculate at the expense of the Government. In view of the complete good faith manifested by Swift & Company in this whole transaction, and the willingness on its part to give up its claim for larger damages for failure of the Government to take the full March delivery, and in the absence of proof that the bellies might have been disposed of anywhere else at a better price, we think the same result should be reached in case of the bellies as in that of the bacon. We think the Government should pay the difference between the fair contract price, as found by the Court of Claims, and the actual sales of the material remaining. In that view there should be added to the recovery on the cross appeal $212,216.69, the excess of the contract price over the net amount realized. The judgment of the Court of Claims is accordingly affirmed for the amount already allowed by it, with directions to allow the additional amount now awarded on the cross appeal.

*Affirmed with modification.*