Moss, Judge,
delivered the opinion of the court:
•With the advent of the United States into the World War the necessity at once arose for the establishment of training camps throughout the country, which called for the allocation of a tremendous number of horses and mules for military use at the various camps. The regular method then in practice by the Government of advertising for bids for large quantities of forage for delivery over a long period of time was found to be impracticable. It was not possible *517 under that method to maintain at all times at-each of-the camps an adequate supply at reasonable prices. In an effort to devise a better scheme for the purchase of such forage supplies conferences were held by officers of the War Department with a number of the more important hay dealers of the country, plaintiff being among the number, and it was agreed that all supplies of hay, straw, and other forage would be purchased by the War Department according to the same method employed by private concerns and under the usual and customary rules of the National Hay Dealers Association. These customs and rules are set forth in Finding II. It was also agreed between the War Department and representatives of the Hay Dealers Association that all orders were to cover periods of thirty or sixty days for the time of completion, and that eighty per cent of the invoice when attached to sight draft with the bill of lading would be paid, and that the balance of twenty per cent would be paid on the inspection, weighing, and unloading at the point of destination, not to exceed thirty days from date of shipment. It was further agreed that defendant would furnish pars at appropriate places for the loading of the hay, and that instructions would be given the railroad company, on the line on which the shipper had delivered his hay, that cars be placed for that particular contract. The entire agreement is established in the record by the uncontradicted testimony of authorized representatives of the Government and confirmed by representatives of plaintiff who participated in the conferences. Circulars were sent to plaintiff and to all other contractors covering the essential features of the agreement, and all subsequent purchases were made in accordance therewith. Under the usual practice following the adoption of the new method, after a contractor had submitted a bid, and it had been accepted, it was later confirmed in writing by the defendant in the form of a letter of acceptance or a purchase order. Purchase orders contained the order number, the date, the shipper’s name and address, the grade and quality of the forage desired, the quantity and price per ton, the schedule of delivery and shipping directions. Defendant has invoked the provisions of section 3744, Revised Statutes, and insists that the pur *518 chase order with certain addenda, which will later be mentioned, constituted the contract, and that no other agreement or understanding may be considered in determining the rights of the parties. It must be remembered that the agreement under discussion was the result of numerous conferences between officials of the War Department and representatives of the large hay dealers of the country, including plaintiff. Prices of hay under the method of competitive bidding had advanced to an abnormal' level with certain prospects of still higher prices. The situation in that respect could not be controlled. It was also practically impossible to maintain an adequate supply at all times at each of the camps. The occasion was extraordinary. It was in this situation that the assistance of the leading hay dealers was solicited. The technical' hindrances of governmental regulations, entirely adequate in times of peace but insufficient in the emergency then existing, were summarily removed and the usual and customary rules of commercial trade — rules which were the outgrowth of years of experience in trading among individuals and private concerns — were adopted. It is stated in defendant’s brief that every purchase order contained the statement that all circulars, specifications, and samples, pertaining to such purchase orders, and put forward by the War Department, or any of its agencies, would constitute a part of the contract. It is undoubtedly true that the vast majority of the purchase orders did contain such a statement. We have not searched the record to ascertain whether or not the statement was contained in each and every purchase order, and there is no direct testimony on this point. Assuming counsel’s statement to be correct, the .agreement, by express terms, became a part of every contract involved herein, for these circulars, as stated above, embodied the essence of the agreement. However that may be, the contract in controversy has been fully performed, and in determining the rights of the parties in this controversy, consideration must be given to said agreement as an essential part of the contract. Clark v. United States, 95 U. S. 542, cited with approval by the Court of Claims in the case of Swift & Co. v. United States, 59 C. Cls. 415, in a discussion *519 of the same general principle as that involved here, the decision in which was affirmed by the United States Supreme Court, 270 U. S. 124. (See also St. Louis Hay Co. v. United States, 191 U. S. 159.)
Plaintiff is suing for the recovery of $66,580.89 set forth in its petition as follows: Erroneous rejections, $39,-268.32; erroneous switching charges, $1,644; failure to furnish adequate cars, $3,824.46; delayed settlements, $512.26; excessive freight charges, $490.32; erroneous freight charges, $1,980.55; contracts on which payments were not made, $1,498.81; erroneous demurrage charges and war tax, $1,192.38; reconsigning charges, $3,565.39; erroneous deductions for variations in grade, $2,025.04; erroneous duty deductions, $281.71; and weight shortages, $10,297.65.
The chief item in point of amount is the alleged improper rejection of hay on the ground that it did not come up to the grade called for in the contract. Plaintiff’s original records made concurrently with each transaction have been introduced into the record. It is shown that, as a rule, the hay was inspected prior to shipment and was graded as meeting the requirements of the contract. It was again inspected and regraded at the Chicago' tracks by other inspectors and was certified as to quality and grade. In each instance the inspection was made by admittedly competent and efficient hay inspectors. This evidence was supplemented in many instances by the inspectors themselves who, with the aid of the original records, were enabled to testify as to the grade and quality of the hay, and have stated that it was of the grade required under the contract. The evidence offered by the Government, in support of its contention that the rejected hay did not accord with the grade called for in the contract, is unsatisfactory. In frequent instances the Government inspector testified that at a certain camp hay had been rejected because not up to the grade — that no hay which came up to the grade had been rejected by him, but on specific inquiry as to whether or not he had rejected any hay shipped by plaintiff, he was unable to give an affirmative answer. In all instances in which the hay rejected was identified by the witness as hay shipped by plaintiff, the court has eliminated *520 same from plaintiff’s claim. The contention of plaintiff that many of the Government inspectors were inexperienced, unskilled, and inefficient is amply sustained by the evidence. The record shows that in numerous instances hay which had been rejected was resold by plaintiff as of the grade called for in the contract, and at prices equal to or greater than the prices obtaining under the contract. On a certain purchase order calling for delivery of No. 2 timothy hay, a number of cars were rejected. In the number was one car which was rejected as “musty, unfit for feed.” The contract price was $27 per ton. After rejection, it was sold for $33 per ton, and this in the face of knowledge by the purchaser that it had been rejected by the Government. Another rejected car was regraded by an official board of trade inspector at Chicago at one grade higher than the contract called for. Still another car of timothy was rejected as containing fifty per cent grass. It was inspected after rejection by an experienced hay inspector, and was found to contain not over twenty-five per cent grass, which under the Government’s specifications is permissible in No. 2 timothy. It was sold for $3 per. ton in excess of the contract price. These are merely a few typical examples which might be multiplied many times tending strongly to sustain plaintiff’s contention that rejections of hay sold and shipped by plaintiff were erroneous and unjustifiable. Plaintiff is entitled to recover on this item the sum of $38,317.22.
Plaintiff is also entitled to recover the sum of $1,644 under the following facts: Two hundred and seventy-four cars of hay were consigned to Camp Custer, Michigan, which is six miles off the main line of the railroad. The Government deducted from the final payment on this shipment a switching charge of $6 per car. Thereafter, the Government denied liability to the railroad company for such switching charges, and did not pay same, and has not refunded same to plaintiff.
In certain instances the plaintiff shipped from a point carrying a lower freight rate than that specified in the contract, and the Government charged against plaintiff the higher rate, and this item, amounting to $490.32, plaintiff is entitled to recover.
*521 Seven cars of bay were shipped by plaintiff and delivered to the Government for which no payment was ever made. Plaintiff is entitled to recover on this item $1,498.81.
According to commercial custom demurrage against cars being held for inspection is paid by the consignee, whether afterwards accepted or not. The Government agreed to this custom, and it was incorporated in many of the purchase orders. Certain deductions, however, were made on account of demurrage and war tax, arising under such circumstances. There is due plaintiff, on account of this item, $1,176.27.
Certain contracts designated Chicago as the f. o. b. point. A large number of cars shipped on these contracts came from different points outside of Chicago. Plaintiff paid the freight from the point of origin to Chicago, the defendant paying freight from Chicago to the camp. The through rate from the point of origin to the camp was lower than the aggregate of the two local rates. In order to receive the benefit of the lower rate from Chicago to the camp, the Government required plaintiff to reconsign the shipment at Chicago, instead of paying the local freight to that point, and then shipping as though Chicago was the point of origin. In order to accomplish this end, it was necessary to pay a reconsigning charge, which, in some instances, plaintiff paid direct to the railroads, and in other cases defendant paid and deducted same from money due plaintiff. The parties agreed in writing that the Government would pay, and the plaintiff would accept the sum of $3,565.39 in full satisfaction of plaintiff’s claim growing out of this controversy. No part of same has been paid and plaintiff, is entitled to recover said sum.
Certain hay was sold by plaintiff f. o. b. Canadian points, for delivery at camps in the United States. In some instances plaintiff paid the import duty, although it was under no legal obligation to do so. The Government refused to take into account such payments of duty in final payment for this hay. In other instances the Government paid the duty and deducted the amounts from its final payments to plaintiff. Under this class of shipment the Government was obligated to pay all import duties. The amount involved in this item is $281.71, and plaintiff is entitled to recover same.
*522 The agreement provided that the hay sold to the Government was subject to inspection at destination by competent inspectors, as to both grade and weight, in accordance with the commercial rules of the trade, actual weight to control. On shipments covered by one hundred and two purchase orders, the Government weights were less than plaintiff’s weights, and this difference was charged against plaintiff, and deducted, from time to time, from sums due plaintiff. This hay was weighed before shipment, and plaintiff has introduced its original records, as in the question of “ erroneous rejections” hereinabove discussed, showing the actual weights under each purchase, and this evidence is supplemented in several instances by the testimony of the weighers themselves, all tending to support plaintiff’s contention that the weights were correct. The inaccuracy of the weights at the point of destination is established by the overwhelming weight of the evidence, and is completely confirmed by the positive testimony of Government officials directly concerned with the transactions in controversy. Plaintiff is entitled to recover for amounts deducted on account of said difference in weights the sum of $10,423.33.
On account of the scarcity of cars, the Government secured and furnished for use by plaintiff cars of any size. There was no agreement that the hay was to be shipped in cars of a certain capacity or that cars were to be loaded to what is commonly understood in commercial usage as the minimum carload weight. Plaintiff loaded all cars to their physical capacity. The Government charged plaintiff with freight on the difference between actual weight and the so-called minimum weight from the point of shipment to final destination, together .with the war tax. Notices of such deductions did not reach plaintiff until payment was made on the twenty per cent vouchers, many months after the hay had been received at its destination. This was improper, and plaintiff is entitled to recover on this item the sum of $3,824.46.
In spite of the difficulties and disagreements which finally resulted in this law suit the new method proved a distinct *523 success from the standpoint of the Government. An adequate supply was at all times maintained at each of the camps. The general price level was substantially reduced. Hay that cost the Government $28 and $30 per ton under the competitive-bid system was thereafter purchased for $12 per ton. There was saved the Government, according to the estimate of Government officials, not less than a million dollars a month.
There were argued with this case two other cases, Dyer & Company, B-119, and Shofstall Hay & Grain Company, B-120, involving precisely the same issues, and submitted on the evidence in the three cases. The high character and business integrity of the plaintiff in each of these cases is attested by the uncontradicted testimony of Government officials connected with the transactions involved in this litigation. The determinative facts on the more important questions involved were supplied by these Government officials.
A comprehensive statement of the situation is found in a decision of the Board of Contract Adjustment of the War Department in a claim of the Carlisle Commission Company (decisions of the War Department, Vol. VII, p. 1011) in Avhich the facts were identical and the same contract or agreement was involved. The decision is printed as an appendix to plaintiff’s brief. The statement is as follows: “The contracting officers intended and endeavored at all times-to carry out the terms of the oral agreement, which was the real subsisting contract; but were prevented from doing so by the force of circumstances beyond their control, and before they could establish an efficient organization for the perform\ance of the Government obligation, hostilities ceased.” (Our italics.) Plaintiff’s claim in the Carlisle case was allowed and paid.
Plaintiff is entitled to judgment, and it is so ordered.
Green, Judge; Graham, Judge; and Booth, Chief Justice, concur.