Booth, Chief Justice,
delivered the opinion of the court:
This is a patent case. The petition alleges that under the act of June 25, 1910, 36 Stat. 851, plaintiffs are entitled to recover for an infringement by the Government of claims 4, 9, 12, 16, 17, 18, 28, and 32 of Letters Patent #831173 granted on September 18, 1906, to John J. Montgomery, now deceased. The Government denies infringement and challenges the validity of the patent.
*544 A preliminary question of title is called to our attention. On July 27, 1914, the plaintiffs assigned an undivided interest in the patent to Frank A. Garbutt. The consideration for the assignment was a duty imposed upon Garbutt to attempt to reconcile the conflicting claims of Montgomery with other inventors in the same art and procure for the Montgomery patent a sufficient recognition to entitle the owners of the patent to realize its worth in money; failing in this, to institute suits for infringement of the patent. Garbutt did commence two suits, both were dismissed without prosecution to a conclusion, and subsequently, i. e., after this suit was commenced, Garbutt reassigned his interest in the patent to the plaintiffs. We think in view of the result of this suit that the contention of the defendant is unimportant.
The petition alleges infringement of claims 4, 9,12, 16, 17, 18, 28, and 32 of Montgomery’s patent. There are forty-six claims in the Montgomery patent.
The plaintiff’s case is predicated largely upon a contention that Montgomery, the patentee, was a pioneer in the art and his patent a basic patent; that he was the first to invent the principle of wing warping to secure equilibrium and lateral control essential to flying; that the other elements of his machine disclose the principles of stability and rudder control, all of which, or their equivalents, are embodied in the Government machines, offered as exhibits of infringing devices. The record in the case is moat voluminous and involved and has required exacting attention and labor. The first vital issue depends upon whether from the record it is to be held that Montgomery was a pioneer inventor and his device a basic patent. If so, his cl'aims, as repeatedly adjudicated, are to be accorded a broader construction than were the situation otherwise. Unless it may be said and established by proof that the inventor has a patent which performs a function which was not performed before, he is not entitled to be designated a pioneer inventor. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537.
Attempts to construct flying machines did not, of course, originate with Montgomery. The art is old, its progress was slow, the early development crude and impracticable. *545 Inventors many decades ago studied the flight of winged animals and sought without -success to imitate their motions and bring into being a device that would accomplish, with the aid of man, what flying birds, eagles, vultures, etc., did with natural ease. This record is replete with a l'arge number of exhibits, publications, and patents which antedate Montgomery by years, disclosing the extent of sustained interest in the art, and efforts made to accomplish flying in a heavier-than-air machine.
Montgomery first centered his attention upon the subject in 1888; from this date until 1886 he conducted a number of experiments with some sort of a mechanism designed as a “ glider.” He does not seem, at this time at least, to have conceived the idea of soaring from the ground and remaining aloft in a device under control. What he was attempting was the construction of a machine that might be released from high altitudes and glide safely to earth under control. From 1886 until 1908 Montgomery turned his attention to other and distinct inventive fields; he contributed nothing to this particular art during this period- In 1903 he renewed his experiments. During that year he came in contact with one Baldwin, a balloonist, who had been making successful glides from a hot-air balloon in a parachute. Baldwin became interested in Montgomery’s efforts and the two entered into a contract, whereby Montgomery was to construct his device, and if it proved successful in descending from a balloon with a man on board the two were to engage in public exhibitions and divide the profits. Montgomery and Baldwin disagreed before any actual experimentation with the prospective glider obtained, and Montgomery thereafter entered into a somewhat similar contract with another balloonist. Montgomery had constructed in May, 1904, a large machine to meet the requirements of the Baldwin contract, and in the summer of 1904 carried on some experiments at the ranch of Peter Cox, in California. The exact and detail structure of his machine is not disclosed. The experiments made consisted in elevating the machine to a desired height by suspending it from a wire to which it was attached, stretched between two upright *546 poles. At the proper time it was released to ascertain its gliding qualities. Other tests were made by resorting to a steep hill, when men, by means of a rope, pulled it down the incline, Montgomery holding onto the device. Just how many and the exact character of the tests so made is impossible of determination. It is sufficient to observe that they were quite numerous. In March, 1905, Montgomery attached his machine to a hot-air balloon, and having secured the services of an aeronaut by the name of Maloney to make the test the machine with Maloney in the saddle seat was released from the balloon at a high altitude and safely glided to earth. On July 8, 1905, Maloney attempting the same experiment lost his life, the machine failing to function.
On April 26, 1905, Montgomery filed his application for the patent in suit. The patent was granted on September 18, 1906.
We have epitomized Montgomery’s early efforts, with respect to which a great volume of proof has been adduced, solely because the plaintiffs have sedulously insisted that the facts are sufficient to antedate the effective date of invention to a time which would exclude reference to certain prior art. A careful analysis of the record upon this point is conclusively convincing that the proof signally fails to sustain the contention. Out of fifty-two prior patents and publications cited in the record all but eight bear dates which make them statutory bars, provided they disclose the structure of the patent in suit. The courts have uniformly held that to show anticipation as against issued letters patent some drawing, some model, some positive means of identification must appear. Oral testimony is regarded as insufficient and unreliable for this purpose. Without exception it is to be discarded, for, however free from intentional misrepresentation, it is uniformly tinctured with the interest of the parties in the litigation and necessarily characterized with acute limitations of the possibility of particular and precise descriptions of the device and its comparison with another. Symington Co. v. National Malleable Castings Co., 250 U. S. 383; Deering v. Winona Harvester Works, 155 U. S. 286; The Barbed Wire Patent, 143 U. S. 275; Torrey *547 v. Hancock, 184 Fed. 61; Emerson & Norris Co. v. Simpson Bros. Corp., 202 Fed. 747.
The flight of April 29, 1905, took place three days after Montgomery’s application for a patent was filed, and is available solely as proof on the point of operativeness.
It is impossible from the record to abstract with any degree of accuracy the detail structure of Montgomery’s early machines. He preserved no data, kept no record of measurements, and left no reliable information from which a court or one skilled in the art might profit from what he did, or ascertain the means he employed to do it. At best, the evidence is probative on the single point that the patentee did on the dates stated do the things described, and discloses only the happening of the chronicled events. True, Chanute in 1894, in his book Progress in Flying Machines, devotes an article to Montgomery’s experiments, in which he outlines in general terms the Montgomery machines, from which one may abstract a conception of general lines of construction; however, it is clear from what was therein said, and the results of the tests described, that it would be hazardous indeed to ascribe to Montgomery a distinct conception at this time of those fundamental principles of aerodynamics, which finally culminated in the invention of the airplanes which it is now claimed infringe the patent in suit. If, however, Chanute’s article did disclose the specific features of Montgomery’s device, then the article itself stands as a statutory bar to the validity of the patent. Montgomery’s articles and addresses printed in the record found publication years after his application for the present patent had been filed and granted, and are purely eto post facto.
There are 46 claims in the Montgomery patent. Infringement is alleged as to claims 4, 9, 12, 16, 17, 18, 28, and 82. The device claimed is manifestly a combination of elements designed to function in certain ways. Fig. 1 of the patent illustrates a side elevation of the patented machine. We reproduce it from the letters patent:

*548

To fly in a heavier-than-air machine, one capable of bearing aloft a man, exacted the creation of a device that would function in a variety of ways. First, it must be capable of soaring from the ground. Second, equilibrium when aloft was indispensable. Third, directional control was equally essential. Fourth, stability must be accomplished, and finally, the means to descend when desired was no less important. Soaring, equilibrium, control, and gliding were concededly indispensable. Noted scientists from an early date discovered the above requisites if a successful flying machine was to materialize. The difficulties encountered *549 were not so much in the discovery and recognition of the principles involved, although tedious and prolonged, as in the means available to apply them in a practical manner.
The claims of the Montgomery patent which disclose the invention we think may be grouped. First, those which are directed toward the accomplishment of equilibrium and lateral control, dealing especially with a change in wing curvature to accomplish the purpose. This group, we think, comprehends claims 4, 16, and 28. Claim 16 being typical and most comprehensive of the group we quote it at this po,int:
“A curved aeroplane with means for changing its curvature, and a horizontal tail behind, which means for swinging it vertically.”
The second group may be said to be directed to the relative arrangement of the supporting and control surfaces, and would include claims 12, IT, and 18. Claim 17 we regard as typical of this group and therefore quote it:
“ In an aeroplane device, plural curved aeroplanes one in .advance of another, and a horizontal tail-surface behind the last aeroplane with means for swinging said tail-surface vertically.”
The third group is made up of certain claims which, in addition to the foregoing, are predicated upon or limited to a specific type or character of supporting surfaces, defined in the claims as “ curved parabolically.” In this group we place claims 9, 12, and 82. Claim 9 we regard as typical and quote it:
“An aeroplane curved parabolically from front to rear, its front portion being rigid, and its rear portion adjustable, with means for adjusting said rear portion relatively to the front portion, to change the surface of the aeroplane.”
Originality and novelty ascribed to the first group reside in the alleged fact that the claims disclose a form of construction whereby through a change in the curvature of the wings, integral w.ith the wing surfaces, equilibrium and lateral control of the machine in flight are secured. Wing surfaces on planes enable the airplane to soar; they furnish, through the reaction of air currents, the “ lift ” and support; *550 when once aloft they function to maintain equilibrium and lateral control, the vital necessity for which is obvious. If the operator desires to turn in either direction, or the lateral equilibrium of his plane is disturbed, he may accomplish the former and retake the latter by a process of change in the wing surface. Montgomery, securing the front portion of h,is wings rigidly and • unmovable to his structure, so adjusted the rear portion relatively to the front portions as to change the surface of his wings by a change in their curvature. He did, by the application of a control device, make it possible to lower one side of the rear portion of his wings, which at the same time functioned to permit the other side of the rear portion to rise and thereby evolved this principle of wing warping. This was accomplished without changing angularly the wing surface, and the claimed novelty resides in making the change of curvature integral w,ith the wings themselves, i. e., the wing itself responded to the movement without the introduction of hinged ailerons. The result was a change in the rear cambered sections of the wings and offered to air currents the essential characteristics of an increased lift upon one side of the plane and a decreased lift on the other, enabling the airplane to turn in either direction.
Montgomery was not the first to recognize or avail himself of the principle of changing the form of wing surface to attain the desired results. On the contrary, he encountered at the outset of his application for a patent two prior patents embodying the conception and was compelled to limit his claims to avo.id the patented structures. Beeson on January 24, 1888, secured a patent for a structure illus-irated by the following device:

*551

Beeson relied upon a curvel plane, to the rear portion of which he hinged an elongated element functioning upwards and downwards, which manifestly served to angularly vary the surface of his wing.
Boswell’s patent, illustrated by his Fig. 1, which we reproduce, disclosed a conception of the structure embodied in certain of Montgomery’s claims as filed. Boswell’s structure also obtained ah angular change in wing surface.
The Commissioner of Patents rejected the patentee’s claims 1, 2, 8, 4, 17, and 24 upon the patents cited above. Montgomery submitted amendments in answer to the rejections, in which he said:
“ The essential distinction of this aeroplane with respect to its capability of changing surface, is that such change is effected and lies wholly within its own integral borders, by a change in its own curvature, in contradistinction to a general angular change such as results from the relative movement of a sectional attachment like the hinged tail of the reference.”
*552 We need not indulge citation to disclose the legal effect of this proceeding.

From the Revue de l’Aéronautique, vol. 4, published at Paris in 1893, we cite the following quotation:
“ It is known that the characteristic of a spiral is to turn about a center from which it is always receding and (fig. 27) that all tangents, at no matter what point of the curve, form similar angles with the radius; it is thus possible to trace spirals of greater or less curvature.
*553 “This curvature is indispensable to a moving surface to enable it to obtain the maximum support in the air. It is also applicable and indispensable to individual feathers and to the propeller blades.
“It may be termed the universal sustentation curve of flight and support in the air.
“ The arching, as regards the degree of curvature of the concavity of the wings, will vary according to the speeds and loads, but without ever losing the character of a spiral. For all wings, without exception, small or large, the central or starting point C of the spiral curve coincides with the front of the wing; the Figures 26 and 27, representing two absolutely similar spirals, afford an example of this. On that of Fig. 26 is seen a full line which shows the shape of a large wing; on Fig. 27 the full line represents another wing, but much smaller. The horizontal lines H indicate the direction of translation. The same wing may change its degree of curvature during flight, but it will be only a modification of the spiral.
“ II. Laws common to all wings
“All wings, of whatever shape and nature they be, must obey the same laws. It can not be otherwise, because the difficulties of locomotion in the atmosphere especially when the latter is' disturbed, and the manoeuvres of starting from and' landing on the ground will be the same for all .aerial machines. Aeroplanes will also inevitably undergo great changes in their weight through the consumption of fuel or by being lightened if they let fall any part of their load to the earth.
“ From all this arises the necessity of being able to guide or to retard or' accelerate the speed of translation. And to be able to attain this end it is necessary that the wings should be capable of making four principal movements during flight:
“ 1. To be moved forwards or backwards in their entirety.
“ 2. To be folded up, so as to diminish or extend their surface.
“ 3. To be warped.
“ 4. To vary at will the curvature of the universal curve.
“All the combinations of frameworks, of articulations, of tendons and membranes are made with this end in view.
“ Because of the great difficulties which accompany the question of speed, we have been obliged to make wings for slow speed and high speed machines.”
*554 Lilienthal in 1895 demonstrates in his Letters Patent #544816 a distinct conception of the value and functioning of curved wings in a flying machine.
Lilienthal was a distinguished engineer and scientist; he successfully accomplished thousands of glides, gave to the art publication of his experiments, and is prominently recognized by more than one outstanding scientist as contributing to the art most vital and necessary principles of the way in which air currents may be utilized in flying machines.
On May 26, 1906, Orville Wright and Wilbur Wright, of Dayton, Ohio, received their patent #821393. The two Wrights first became interested in aviation in 1896. They were close students of the science, and early in their careers became convinced that • equilibrium and control were the vital factors to be obtained if a heavier-than-air machine was ever to materialize. To this end they devised in July, 1899, a method of twisting or warping wing surface. A model was constructed along this line, a model clearly disclosing the conception of shifting one wing surface forward or back relatively to the other, and warping them by the same movement. This model was tested and responded satisfactorily. In 1900 the Wrights constructed a man-carrying model and it was tested at Kitty Hawk, North Carolina, in September and October, 1900. This particular machine, a glider, speaking now of wing surfaces, was so constructed that adjustments connecting the wings by flexible joints with upright posts, enabled the operator, “ lying prone in a cradle,” to actuate a wing warping effect by the sidewise movement of his body. The machine was flown a number of times with an operator on board during some of the flights, and without one at other times. It is true that the wing warping was accompanied by changing the relative position of the wings in flight, and not in the precise manner the patent in suit at a later point of time disclosed; but the demonstration of the effectiveness of the principle was firmly established. Lateral control and equilibrium were obtained for the first time effectively, leaving open to subsequent inventors the solution of a better method, if possible, to obtain the identical result. The Wrights, so far as the record herein is concerned, were the first to construct a device which sue- *555 cessfully functioned in the desired way. The Wrights were assiduous in experimentation. In July, 1901, at Kitty Hawk tests of a larger machine were made in the presence of a number of persons, including one very distinguished scientist. These tests involved a number of flights, and many of them were decidedly successful. Without recounting in detail the number of tests made by the Wrights, and the success which followed their scientific and laborious investigation of the art, it is sufficient to state that on December 17, 1903, the Wrights demonstrated the possibility of successful flying in a heavier-than-air machine, motor driven, carrying and subject to the control of a living operator. This machine soared from the ground, demonstrated the possibility of control in sustained flight, and glided safely to earth in response to the operator’s desire. The significance of the Wright invention is disclosed by the following figure reproduced from the Wright patent:

*556 Among the specifications accompanying the Wright patent are the following ones applicable in part to wing warping:
“A hem is formed at the rear edge of the cloth to receive a wire 7, which is connected to the ends of the rear spar and supported by the rearwardly extending ends of the longitudinal ribs 5, thus forming a rearwardly extending flap or portion of ,the aeroplane. This construction of the aeroplane^ gives a surface which has very great strength to withstand lateral and longitudinal strains, at the same time being capable of being bent or twisted in the manner hereinafter described.
“ When .two aeroplanes are employed, as in the construction illustrated, they are connected together by upright standards 8. These standards are substantially rigid, being preferably constructed of wood and of equal length, equally spaced along the front and rear edges of .the aeroplane, to which they are connected at their top and bottom ends by hinged joints or universal joints of any suitable description. * * * It will be seen that this construction forms a truss system which gives the whole machine great transverse rigidity and strength, while at the same time the jointed connections of the parts permit the aeroplanes to be bent or twisted in the manner which we will now proceed to describe. * * *
“ The part of the rope 15 under tension exercises a downward pull upon the rear upper corner d of the structure and an upward pull upon the front lower corner e, as indicated by the arrows. This causes the corner d ,to move downward and the corner e to move upward. As the corner e moves upward it carries the corner a upward with it, since the intermediate standard 8 is substantially rigid and maintains an equal distance between the corners a and e at all times. Similarly, the standard 8, connecting the corners d and A, causes the corner A to move downward in unison with the coimer d. Since the corner a thus moves upward and the corner A moves downward, that portion of the rope 19 connected to the corner a will be pulled upward through the pulley 20 at the corner. A, and the pull thus exerted on the rope 19 will pull the corner b on the other side of the machine downward and at the same time pull the corner g at said o.ther side of the machine upward. This results in a downward movement of the corner b and an upward movement of the corner o. Thus it results from a lateral movement of the cradle 18 to the right in Fig. 1 that the lateral margins a d and e A at one side of the machine are moved *557 from their normal positions in which they lie in the normal planes of their respective aeroplanes, into angular relations with said normal planes, each lateral margin on this side of the machine being raised above said normal plane at its forward end and depressed below said normal plane at its rear end, said lateral margins being thus inclined upward and forward. At the same time a reverse inclination is imparted to the lateral margins b c and f g at the other side of the machine, their inclination being downward and forward. These positions are indicated in dotted lines in Fig. 1 of the drawings. A movement of the cradle 18 in the opposite direction from its normal position will reverse the angular inclination of the lateral margins of the aeroplanes in an obvious manner. By reason of this construction it will be seen that with the particular mode of construction now under consideration it is possible to move the forward corner of the lateral edges of the aeroplane on one side of the machine either above or below the normal planes of the aero-planes, a reverse movement of the forward corners of the lateral margins on the other side of ;the machine occurring simultaneously. During this operation each aeroplane is twisted or distorted around a line extending centrally across the same from the middle of one lateral margin to the middle of the other lateral margin, the twist due to the moving of the lateral margins to different angles extending across each aeroplane from side to side, so that each aeroplane surface is given a helicoidal warp or twist.”
The claims of the patent, 18 in number,- disclose clearly the structure specified. Beyond dispute is the established fact from evidence of not only oral witnesses but many written documents that the Wrights did embody in their aeroplane a complete conception of and means for imparting to the rear portions of an aeroplane wing a change therein which was intended to and did function to “ present to the atmosphere different angles of incidence,” and “ were capable of being moved to different angles relatively to the normal plane of the body of the aeroplane.”
In view of the extent of the prior art evidenced by granted patents and the innumerable publications part of the prior art, a subject much too voluminous to discuss in detail, it seems to us idle to contend that Montgomery was a pioneer in this particular field. A change in the surface of aeroplane wings, a change of curvature to effect equilibrium and control in flight, were among the very first principles recognized *558 by a long list of preceding inventors and scientists, many of whom gave to ,the art the benefit of thousands of experiments and disclosed most valuable data long before Montgomery invented his device. The necessity for a curved wing surface and means of changing the same is illustrated in more than one patent, the inventors clearly conceiving the importance of this form of construction ,to obtain the reactions of air currents.
If more is needed to preclude the allowance of a broad construction of the patentee’s claim, we think it is to be emphatically found in an article published in McClure’s Magazine in June, 1897, by Professor S. P. Langley. This article contains not only a disclosure of wing construction as embodied in Langley’s experimental devices, but exhibits by various photographs a completed device resembling closely the patent in suit, i. e., two wing surfaces, mounted in tandem fashion upon a long steel supporting rod, each slightly curved, at the rear of which appears a rudder adapted both for vertical and horizontal steering, a concrete demonstration of the fact of not only the prior existence of a flying device constructed in form and fashion as the patentee constructed his device, but following in the footsteps of practically all prior inventors in the use of curved wing surfaces.
Montgomery’s patented device was not received commercially ; none of his machines were ever sold or met with any public demand. The patent was never put to any practical use, and, so far as the record discloses, inventors active in the art as well as the public generally did not accord the machine that full measure of inventive recognition usually attendant upon a pioneer patent. The courts have uniformly taken into consideration; in the construction of claims for which basic invention is claimed, the question of the general and practical utility of the device asserted to be pioneer in character. The Supreme Court in the case of Deering v. Winona Harvester Works, 155 U. S. 286, 295, used this language: “ If Olin had been the first to devise a contrivance of this description for adjusting the flow of grain upon the main elevator, it is possible that, under *559 the cases of Ives v. Hamilton, 92 U. S. 426, and Hoyt v. Horne, 145 U. S. 302, a construction broad enough to include defendant’s device might have been sustained. But in view not only of the prior devices, but of the fact that his invention was of doubtful utility and never went into practical use, the construction claimed would operate rather to the discouragement than the promotion of inventive talent. Not only does it appear that the device described in this patent did not go into general use, but that the mechanism set forth in the patent to Bullock & Appleby of October 31, 1882, under which the defendants manufactured their machines, was extensively sold throughout the country for about eight years before any assertion of adverse right under the Olin patent.” To the same effect are the following cases: Boston Woven Hose & Rubber Co. v. Pennsylvania, Rubber Co., 164 Fed. 557; Henry v. City of Los Angeles, 255 Fed. 769, 780.
The sequential history of the art circumscribed the opportunity for inventive genius as to the construction of wing surfaces at the time Montgomery designed his structure. The latitude for novelty in this respect was limited to sui generis forms and modes of adjustment. The necessity for curved wings and wing warping had been anticipated. It had been successfully demonstrated in an empirical way, and was distinctly recognized as an established principle of aeroplane flight, so that Montgomery, as the history of his application for and allowance of patent expressly discloses, was limited to the precise disclosure of his claims in this respect. Preceding 1905, inventors were active in the art. Intensive study and experimentation were in progress on a large scale, and the record absolutely precludes the possibility of assigning to Montgomery more than his claims specifically call for, and to that precise limitation we think his patent is restrained, including the claims grouped in group one. The defendant furnished the plaintiffs with plans and specifications of two flying machines, illustrative of the character of machines being used by the Government at the time the petition herein was filed. Both parties have used and relied upon these machines as determinative of the *560 issue of infringement. They are known in the record as Exhibits #114 and 115, the latter being known as the “ flying boat.”
The plaintiffs contend, quoting from one of their expert witnesses, that in both Government machines “ the wing surfaces have a curvature and are not of flat plate. They are a refinement of the parabolic or cambered wing principle. The wings have hinged ailerons at their rear parts, giving a variable curvature to the wing, the front portion remaining rigid, which is similar to and identical in principle with what the Montgomery patent provides for.” Taking the above contention literally, as expressed above, it is apparent that the wing surfaces of the alleged infringing' airplanes are not the exact counterpart of those claimed in the patent. Obviously, the wing surfaces of the Government planes are not curved parabolically. The Government wings are not identical in contour with respect to top and bottom, and the change effected in their surfaces is an angular change brought about by “ hinged ailerons ” on their rear portions. The patentee was compelled to amend his claims by the examiner, of the Patent Office to escape anticipation predicated upon hinged ailerons, and while the functioning element of hinged ailerons secures equilibrium and lateral control, the method adopted is quite distinct from that disclosed in Montgomery’s claims. The Government planes present no refinement of the parabolic principle. On the contrary, the completed wing structure discloses a perceptible divergence in both contour and breadth of construction. Montgomery’s wing surfaces were precisely the same on both top and bottom; there was no variance of contour; the cambered sections were identical, and being constructed out of a single layer of canvas obtained no variance in breadth. It is true the Government planes are rigid in their front portions, but the process of change of wing surface is not in any respect identical with Montgomery’s specifically claimed method of a change of curvature integral within the wing itself. We are unable to perceive the possibility of reading plaintiffs’ claims which call for a change of curvature in the plane surface upon the Government structure.
*561 The second group of claims covers specifically the relative arrangement of supporting and control surfaces. Montgomery mounted upon his structure two wings arranged in tandem fashion; to the immediate rear of the second wing a large fin, practically semicircular in form, intersected midway by a smaller vertical plane, was so mounted and adjusted relatively with the control features of the device as to respond to a vertical movement. About midway between the first and second plane a saddle was suspended for occupation by the operator, his feet and arms being free to function the control adjustments.
Stability is, of course, an essential element in flying. If equilibrium is to be maintained, as pointed out by the record, the firmness of the structure and its ability to maintain equilibrium, both in lateral and other angles of flight, are of paramount importance. As pointed out in the defendant’s brief, “ stability is the property which tends automatically to restore an airplane to its position of equilibrium without application of the controls.” The art unquestionably teaches and has demonstrated long since that to avoid direct precipitation downward, known as “ nose dives,” and overcome any tendency to roll, tip, or pitch, either upwards, downwards, or sidewise, to restore a plane to equilibrium a form of construction must be made available, strong enough within itself to receive the pressure of the air either upon the top or bottom portions of its surface. From Montgomery’s claims in this group the contention is advanced that his rear wing acts as a stabilizer and secures the desired results; that the adjustment of the rear portions of the rear wing so as to effect a change of curvature, in connection with the movable fin and small vertical plane intersecting the same, capable of vertical movement, is the equivalent of the Government’s structure designed to secure stability and control. Accrediting expert testimony, especially where it harmonizes, two inescapable principles attach to stabilization: First, the stabilizing surface, as previously observed, must be of sufficient rigidity to withstand the pressure of a,ir currents upon both its upper and lower portions. It as frequently happens in the restoration of equilibrium that air pressure *562 from above be obtained as from below; in each instance the necessity is due to the inclination of the airplane. Second, the angle of incidence becomes important. The stabilizing plane must be located at such a distance back from the center of gravity as to practically produce a zero angle of incidence relatively to the forward wing.
The stabilizing plane affords no support; it does not function as a “ lift.” While movable in some machines, in accord with certain required adjustments, it furnishes no sustentation; consequently, the development of the art clearly discloses that uniformly the stabilizing plane has been of much less dimensions than the supporting wings of the machine, and because of its location and mounting on the structure is incapable of performing the double function of aid in soaring and maintaining stability in flight. Montgomery’s rear wing, as specified and claimed, is inherently so constructed as not to be adapted to receive pressure from above; it functions as a companion to the forward wing in obtaining support and equilibrium. The very structure of the wing with its rear portions capable of change in curvature negatives the possibility of continued rigidity. While the front portions of the wing are stationary, the claimed novelty of a change of curvature precludes the possibility of the same conditions upon the rear portions, as they are admittedly flexible. There is nothing in the specifications or claims of Montgomery that points out a utilization of or the possible funq-tioning of his rear plane as a stabilizer. The specification recites “ investigation has shown me that a wing is a specially formed surface placed in such a position as to develop a rotary movement in the surrounding air. This position is determined by mathematical considerations. The movements in the air are of such a nature as to make it possible to separate the wing-surface, as I have done in my device, into front and rear sections and maintain the special rotary movement of the air which lies at the basis of this phenomenon.” The rear wing of the Montgomery patent was identical in contour and construction with the forward wing; its adjustment with relation to the control system, activated by the operator, clearly discloses, in our opinion, that the inventor did not contemplate or conceive the possibility of it *563 functioning as a stabilizer. In addition to this, the record is convincing that the contention advanced to sustain the proposition fails to sustain as a principle of aerodynamics that the patentee’s rear wing is capable of functioning as claimed.
The stabilizing plane in the Government airplanes is located at and slightly extended over the rear end of the fuselage. It is stationary, less than 10% of the forward wing surface and set at a negative angle of incidence. The record is free from disputation that as so mounted and constructed it operates successfully as a stabilizing plane.
It is apparent that the stabilizer of the Government airplanes has a totally dissimilar function from that possessed by a supporting surface or aeroplane. It therefore becomes impossible to apply those claims of Montgomery (claims 12, 17, and 18), which call for “ plural curved airplanes, one in advance of the other,” to the Government structure by attempting to designate the stabilizer as the rear airplane without doing violence to the well-known doctrine of equivalents.
It is next insisted that Montgomery’s horizontal tail surface in the rear of his second wing, with means for swinging said tail surface vertically is the equivalent of the Government’s construction designed to afford directional control. Montgomery employed and his claims embrace the horizontal fin, intersected midway by the small vertical plane, the combination being so attached to the control adjustments as to function vertically upon the application of pressure by the operator. The Government planes utilize a small horizontal fin to the immediate rear of which is hinged a movable rudder functioning vertically. To the immediate rear of the Government’s stabilizing plane two distinct continuations of the plane are separately hinged, capable of vertical movements, known as elevators. Within the space separating the two elevators the horizontal rudder is afforded freedom of movement horizontally. The principle of equivalents is predicated upon the similarity of the functions the two devices perform. As said in Graham v. Mason, 5 Fish. 11:
“ Infringement depends not so much upon the form of the particular device in question, or upon the name given *564 to it in the specification by the construction, as upon the functions it performs, and it is well-settled law that if one device is employed in a similar combination as another, and performs the same function in the same way, the two are substantially the same, although they may be different in form and may be known among mechanics by different names.”
Montgomeiy evidently followed in the wake of preceding-inventors in his conception of the rear surfaces necessary to secure directional control. The fin surface to which the vertical plane was permanently attached moved in unison vertically, and while it may have functioned to have in some degree afforded the desired control, it was not, so far as this record is concerned, adapted either as to location or construction to afford the two essential movements, i. e., the horizontal and vertical movements obtained by the Government machines through the horizontal rudder and the separate vertical elevators. These surfaces, as practical demonstrations proved, did not function in the same way the Government’s machines functioned. In addition to this, Prof. Langley’s article in McClure’s Magazine, published in 1891. both by description and illustration exhibited this form of structure and the principle wa,s clearly disclosed in the Wright brothers’ machine. True, the location in the Wrights’ machine was directly the opposite of what it was in Montgomery’s patent, but the functioning element of the device was precisely similar. Early inventors recognized the necessity for rear fin surfaces, a surface likened in the record to the feathered tip of an arrow, to secure directional control; it was not new.
The scope for invention was narrowed to a structure capable of utilizing air currents to obtain both lateral control and altitude. It would be difficult indeed to ascribe to Montgomery the first successful accomplishment of this purpose, in view of the prior art and the repeated decisions of the courts holding the Wright brothers to have been pioneer inventors in an art when this identical subject is of such vital importance. Wright Co. v. Herring-Curtiss Co., 211 Fed. 654, 117 Fed. 257, 204 Fed. 597; Wright Co. v. Herring-Curtiss Co. (C. C. A.), 180 Fed. 110; Wright Co. v. Paulhan, *565 177 Fed. 261; Wright Co. v. Paulhan (C. C. A.), 180 Fed. 112. The Montgomery device does not, in our opinion, disclose the essential elements to obtain the desired end. It was not accorded by those skilled in the art the possibility oí practical use, and demonstrations proved its inability to so function.
The third group of claims, i. e., 9,12, and 32, is apparently limited to a specific type or character of supporting surfaces defined in the claim as “ curved parabolically.” Claim 9 is typical of this group. It is in the following language :
“An aeroplane curved parabolically from front to rear, its front portion being rigid and its' rear portion adjustable, with means for adjusting said rear portion relatively to the front portion to change the surface of the aeroplane.”
The plaintiffs insist that the claims involved are not so limited; that the specifications iñ conjunction with relative claims involving character of wing surfaces clearly entitled the inventor to a broader construction of the claims in this respect. We have heretofore noted the cour,se of the pat-entee’s application through the Patent Office and the effect of the examiner’s ruling. A court called upon to construe a patentee’s claims finds therein significant technical words definite in character and imparting a distinct description in the art to which the claim appertains; obviously they are to be given effect; they may not be eliminated. The patentee had in mind something more than a generalization when he employed limiting words. The contour of supporting wing surfaces, as clearly disclosed by the great volume ,of expert testimony, was a factor which inventors recognized as of weighty importance. The distinct curvature and structural feature of wing surfaces, both as to upper and lower surfaces of the wings, afforded not alone the full measure of air pressure upon the lower surface but functioned to obtain the vacuum lift upon the upper .surface. ■ Curved wings, as previously observed, were not new. They were distinctly old in the art. This record is replete with old devices disclosing curved wings. True, many of the illustrations are crude, but the functioning of curved wings had been demonstrated prior to the advent of Montgomery, so that the significance of a parabolically curved wing is apparent. It is *566 hardly possible that the Patent Office would have ascribed novelty to a curved wing surface. Montgomery was an experienced and educated inventor. He was not a mere adventurer in the art depending upon chance for a patent. In addition to his accomplishments as a scholar he possessed talents as a skilled mechanic, constructing his own devices, and his implicit faith in the soundness of his conceptions cost him his life. In view of this situation, with the whole of the English language at his command, we are prevented from concluding that he did not intend a specific limitation of wing surfaces when he used the words “ parabolically curved.” There was merit in a parabolically curved wing surface. Such a surface did function as the inventor contemplated it would, and while the question of the validity of Montgomery’s claims in this respect is an exceedingly close one, a question we need not' determine, we are of the opinion that the claims now under discussion were limited to this specific form of curvature.
It is an axiomatic principle of patent law too well sustained to warrant extensive citation that under the patent statutes the claims of the patentee define the patent, and when the language used is not obscure or ambiguous and has a settled meaning, courts are not at liberty to enlarge the same by construing them to intend something different. The Supreme Court in the case of White v. Dunbar, 119 U. S. 47, decided a similar contention to the one in this case. We think the decision apropos. The wing surfaces of the Government airplanes were not “ parabolically curved.” The dissimilarity is apparent.
We can not discuss in infinite detail the great number of technical and general issues raised by both sides in this case. We do not minimize the importance of the various contentions. Suffice it to say that in the opinion of the court the Montgomery patent, irrespective of its validity, was one limited to its peculiar structural features, a designed combination of elements old in the aft, utilized by the inventor to function in a certain novel way. The degree of novelty and invention to be ascribed to such a patent is limited to the specific device produced. The burden of estab- *567 Iisbing the use of equivalents or the device itself is upon the inventor who alleges infringement, and granting to the plaintiffs the widest latitude in this respect we are unable to find from the record wherein the Government machines have trespassed upon the patentee’s devices or adapted equivalents in the structures it used. Subsequent to the Wright patent the art developed rapidly. The machines used by the Government functioned with a degree of success decidedly and emphatically impossible of attainment by the employment of any of the elements of Montgomery’s patent utilized as he utilized them. Whatever features of similarity in construction might be claimed between the Government and the Montgomery machines may only be found in a most technical evolution of obscure detail of construction and claims, which upon investigation disappear when tested by the prior art and faced with actual differences. The Montgomery and Government structures present such a distinct divergence of structural detail and functioning capacity that it is impossible to read the claims of the Montgomery patent upon the Government machines.
The petition will' be dismissed. It is so ordered.
Green, Judge; Moss, Judge; and Graham, Judge, concur.