## MYERS v. UNITED STATES.

### No. C–700.

Court of Claims.

Dec. 5, 1938.

Max D. Ordmann, of New York City (Edward Raff, of New York City, on the brief), for plaintiff.

Thomas B. Booth, of New York City, and Sam E. Whitaker, Asst. Atty. Gen. (J. F. Mothershead, of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

BOOTH, Chief Justice.

The plaintiff alleges that the defendant infringed his patent No. 1226985 granted May 22, 1917, for a Flying Machine. In both the briefs and oral argument the contention is made that plaintiff's patent is a basic one and plaintiff a pioneer inventor. Finding 5 discloses the claims at issue. Ten are relied upon by plaintiff.

Finding 4 depicts in accurate terms, and also discloses by illustrations, plaintiff's conception of a flying machine and the specified manner of its operation. The facts therein found and the illustrative figures are taken from the patent in suit.

The patent relied upon by plaintiff was granted to him on May 22, 1917, upon an application filed in the Patent Office September 20, 1905. This last date becomes an important element in the decision of this case, and its determinative character exacts a discussion of the issue as to the validity of the patent in suit in view of the prior art.

The defendant introduced into the record a great many foreign and domestic patents pertaining to the art involved which had been issued prior to plaintiff's application of September 20, 1905. In addition to prior art patents, several important scientific publications having to do with the art of aviation were introduced, each one antedating the plaintiff's application for the patent relied upon.

Finding 3 recites, and it is manifestly accurate as scientific principles disclosed, that a flying machine, i. e., a heavier-than-air machine, one capable of soaring in the air and susceptible to being guided by a pilot into different attitudes when aloft, involved at least three basic elements. The inventor interested in the art faced the problem of creating a mechanism which would not only utilize them but bring them within the reach of control.

The task was not an easy one. First, it was absolutely essential that the mechanism possess some means of "exerting lift." A balloon—old in the art—could be and was used to obtain altitude. Balloons when inflated with hot air or a gaseous medium could "exert lift." However, it was soon discovered that attaching a balloon to a mechanism designed to fly when the balloon was either detached therefrom or inflated in midair was not only hazardous but in no way contributed to the art of creating a mechanism capable of "exerting lift" without resort to extraneous means.

The "lift" problem was successfully solved some years before the plaintiff's patent came into existence. Wing surfaces were so scientifically constructed that when the mechanism was propelled through the air at a suitable angle the essential element of "exerting lift" obtained. The mechanism as a unit arose from the ground and the question of attitude was one for the pilot.

The second essential element in any flying mechanism of the character here involved is propelling means. In saying "the second essential element" we do not mean in degree of importance, for obviously cooperation is essential. Propelling means are obtained from combustion engines designed and adjusted to operate a propeller or propellers, which, as Finding 3 discloses, "exert a forward thrust." To invent an aeroplane engine exacted a high degree of inventive skill. To conceive its use as a propelling means did not. The problem in the beginning was one of weight.

It was not in any sense new at the time plaintiff was granted his patent to employ a combustion engine or engines to obtain propelling means for a flying mechanism. It is true the plaintiff specifies the use of two engines of his mechanism not only to obtain a forward thrust of the same but also to steer it either to the right or left as desired. This feature is immaterial to the present issue. The defendant's mechanism did not in any way adopt it.

An indispensable element of any flying machine is a control mechanism. The control of the equilibrium of a flying machine relative to "its attitude about the three rectangular axes of the machine" is manifestly of fundamental importance, and was from the beginning a subject matter of extensive research and experimentation. The history of the art is extensive with respect to means of control.

502

It is necessary to refer to Figures 1 and 3 of Finding 4 to understand plaintiff's patent with respect to control mechanisms. To obtain lateral control two rudders, $v^3$ and $v^4$, are attached as indicated in Fig. 3. The two rudders are pivoted so as to respond to the desired manipulation of suitable cords and designed to steer the mechanism to the right or left. They are as plaintiff states: "mounted on either side of the longitudinal center line of the machine" and are intended "to turn the latter about its vertical axis."

Equilibrium or attitude control was effected by utilizing three (3) horizontal propeller blades f–1, f–13, and f–14, Fig. 3. Two of the blades are located in the rear of the machine and one in front, each one being mounted so as to rotate upon a vertical axis. Rotation of the blades is secured by power from the engines "by means of belts, pulleys, and clutches." To

lift the front of the machine f-14 is alone actuated, it being asserted that this operation causes the exertion of a lifting force and serves to tilt the same upwardly.

Propellers f-1, f-13, actuated either separately or simultaneously, are designed as the findings show "to alter the attitude of the machine about the flight axes", and in the patent specifications the public is told that the two rear lifting screws used conjointly will function to cause the machine to attain a higher or lower level.

What has been said does not point out in technical detail all the elements going to make up the plaintiff's mechanism. Reference to Finding 4 and the illustrative figures 1 and 3 will supply the purposely omitted details. The plaintiff's claim is that he was the first to conceive and later construct a flying machine which disclosed and taught to those skilled in the art the mechanical means for utilizing the scientific factors essential to flying.

Plaintiff contends that his patented mechanism provides lifting means similar to or the equivalent of the alleged infringing ones, and a like contention is advanced with respect to propulsion and control means. It is argued with earnestness that the three (3) "lifting screws" or propellers f-1, f-13 and f-14 are the same as ailerons appearing in modern machines subsequent to his patent application.

The obstacle the plaintiff's contention encounters is the established fact that all the elements entering into his patented mechanisms were old in the art prior to his patent application of September 20, 1905, i. e., granting arguendo that what is claimed for the patent is as claimed. The plaintiff vigorously contends that the applicable prior art cited by defendant is not in fact prior art and not anticipatory. The contention rests upon a prior application of plaintiff filed January 29, 1897, the plaintiff asserting that his application of September 20, 1905, which finally matured into the patent in suit, is a continuation of his application of January 29, 1897.

We first take up the prior art. The findings disclose a number of prior art patents and prior publications. The citations are too numerous to discuss separately and while not confining anticipation to the patent granted to the Wright brothers upon an application therefor filed March 23, 1903, we believe this patent so clearly anticipates the one in suit that a discussion of others is unnecessary.

The 1903 machine of the Wright brothers is shown photographically in the findings, and the history of its development is likewise disclosed, commencing with Finding 19. This Wright machine was of the biplane type. Its two wings had a span of about 40 feet and a depth of 6½ feet. Each wing was curved and separated horizontally by a plurality of front and rear struts, thus dividing the wings into a series of eight panels, the central ones being rigid both fore and aft.

The Wrights used an internal-combustion engine for the same purpose plaintiff did, and the Wright method of wing warping to obtain lateral control, the equivalent of ailerons, was effective and successful. A horizontal rudder system to obtain elevational control was an element of the Wright machine, and directional control was secured by a vertical rudder system. Therefore, it is apparent that every feature of the patent in suit involving a lifting, propulsion, and controlling means was anticipated by the Wrights and other inventors.

If the claims of plaintiff's patent are given such a construction as to enable them to be readable upon the alleged infringing machines they will be readable with equal facility upon the prior art as exemplified by the Wright machine of 1903. An examination of the illustrated USD–9A, an alleged infringing machine (Finding 10), forces the irresistible conclusion that plaintiff's conception as embodied in the specification and claims of his patent was neither original nor new.

The USD–9A machine discloses ailerons A–A for lateral control, the horizontal rudders E–E for elevational control, and the vertical rudder R for directional control. The wing surfaces, propellers and structural features to obtain lifting power and stability exemplify in detail the Wright brothers' conception and patent of 1903. The Wright patent has been held valid. Wright Co. v. Herring-Curtiss Co., D.C., 204 F. 597; Id., 2 Cir., 211 F. 654.

In the case of Montgomery v. United States, 65 Ct.Cl. 526, 554, 555, this court said: "The Wrights, so far as the record herein is concerned, were the first to construct a device which successfully functioned in the desired way. The Wrights were assiduous in experimentation. In July, 1901, at Kitty Hawk tests of a larger machine were made in the presence of a number of persons, including one very dis-

504

tinguished scientist. These tests involved a number of flights, and many of them were decidedly successful. Without recounting in detail the number of tests made by the Wrights, and the success which followed their scientific and laborious investigation of the art, it is sufficient to state that on December 17, 1903, the Wrights demonstrated the possibility of successful flying in a heavier-than-air machine, motor driven, carrying and subject to the control of a living operator. This machine soared from the ground, demonstrated the possibility of control in sustained flight, and glided safely to earth in response to the operator's desire."

The machine specified and claimed by the present patentee never flew. It has never been recognized by those skilled in the art as practical or operative.

■ We come now to plaintiff's vigorous contention that the patent in suit is a continuation in part of his first patent application No. 621,233 filed January 29, 1897, and if so the Wright brothers' machine and others are not prior art. The rule of law applicable is well established. Chapman v. Wintroath, 252 U.S. 126, 40 S.Ct. 234, 64 L.Ed. 491.

■ The question of continuity of invention as applied to applications for patents filed upon different dates to entitle an earlier one to priority is one of fact. The question of law involved in the issue is stated by the court in the case of Good Roads Co. v. Charles Hvass & Co., 2 Cir., 70 F.2d 625, 627. The court said:

"To support the claim of disclosure in the abandoned application, it must appear that there was a complete disclosure. General Electric Co. v. Continental Fibre Co., 256 F. 660, 664 (C.C.A.2). There it was said:

"'* * * The doctrine of continuity "broadly depends upon whether the substituted application is for the same invention as that disclosed in the original application." * * * The queries in this case * * * are these: Could the claims in suit have been properly issued on the original specification.'"

The court's Findings 7 and 8 are the result of a careful examination of the record with respect to plaintiff's contention upon this point, and we are convinced that the findings are fully and completely sustained. We need not review the testimony in detail;

it is lengthy, and, while not involved, exacts a factual discussion which the record does not warrant. In the Esnault-Pelterie Case, U. S. v. Esnault-Pelterie, 303 U. S. 26, 29, 30, 58 S.Ct. 412, 414, 82 L.Ed. 625, the Supreme Court said: "In a patent case in the Court of Claims under the act of 1910 the questions of validity and infringement are questions of fact. We have said that, for the purposes of our review in such a case, the findings of the Court of Claims 'are to be treated like the verdict of a jury, and we are not at liberty to refer to the evidence, any more than to the opinion, for the purpose of eking out, controlling, or modifying their scope.'" Brothers v. United States, 250 U.S. 88, 93, 39 S.Ct. 426, 63 L. Ed. 859; Stilz v. United States, 269 U.S. 144, 147, 148, 46 S.Ct. 37, 70 L.Ed. 202; United States v. Esnault-Pelterie, supra. The requirement that the Court of Claims should find the ultimate facts which are controlling places upon that court the duty of resolving conflicting inferences and to draw from the evidence the necessary conclusions of fact. United States v. Adams, 6 Wall. 101, 112, 18 L.Ed. 792. Even though the finding determines a mixed question of law and fact, the finding is conclusive unless the court is able "to so separate the question as to see clearly what and where the mistake of law is." Ross v. Day, 232 U.S. 110, 117, 34 S.Ct. 233, 235, 58 L. Ed. 528; United States v. Omaha Indians, 253 U.S. 275, 281, 40 S.Ct. 522, 64 L. Ed. 901; Stilz v. United States, supra; United States v. Swift & Co., 270 U.S. 124, 138, 46 S.Ct. 308, 70 L.Ed. 497.

■ The Commissioner of Patents upon two occasions declined to allow the contentions, and we think it clear that the claims relied upon in the instant case could not have been issued upon plaintiff's 1897 application.

Plaintiff's date of invention does not antedate September 20, 1905, the filing date on which the patent in suit was granted and plaintiff is not entitled to any earlier date.

■ From the prior art and knowledge set forth in the findings of fact and which we have discussed supra, particularly in connection with the Wright 1903 biplane, we are of the opinion that the claims in suit are not directed to novel and patentable subject matter and are therefore invalid.

The petition is dismissed. It is so ordered.