ELECTRIC BOAT COMPANY v. UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 159.   Argued January 11, 14, 1924.—Decided January 28, 1924.

Where the United States, without disclosure to it of the scope of an
    application for patent, obtained by a contract with the applicant
    a license, at certain rates, to manufacture and use the devices
    covered by the application, and was later sued by the licensor for
    its use of a device procured from another, which the licensor
    claimed came within his application and subsequent patent, *held:*
    (a) That the Government was not estopped from showing, by attendant facts and circumstances, that the contract was not intended
    by the parties to apply to the device so used, and (b) that a
    judgment of the Court of Claims, so limiting the contract, upon
    facts found, was not erroneous as a matter of law.   P. 627.
7 Ct. Clms. 497, affirmed.

APPEAL from a judgment of the Court of Claims rejecting the appellant's claim, upon the facts found from the evidence.

*Mr. Dean S. Edmonds* and *Mr. Frederick P. Fish,* with whom *Mr. William H. Davis* was on the brief, for appellant.

A single question is presented, namely, whether or not the torpedoes constructed are within the patent, and therefore within the license and subject to the royalty payment provided for therein.

No question arises as to the validity of the Davison patent, because appellee is a licensee under the patent. *Eclipse Bicycle Co.* v. *Farrow,* 199 U. S. 581; *Harvey Steel Co.* v. *United States,* 196 U. S. 310.

The patent must be construed, particularly with respect to the claims indicated, to determine whether or not appellee's torpedo falls within it. This is a question of law to be decided by the Court. *Singer Mfg. Co.* v. *Cramer,* 192 U. S. 265.

Appellee's construction in all essential respects is identical with the construction of the Davison patent.

The only difference worthy of comment between appellee's and the patented constructions relates to the automatic regulator of the Davison patent. The characteristics attained by the use of the regulator were fully realized by Mr. Davison and were pointed out by him in his patent. But he realized also that these features were subsidiary to and refinements upon the general principle of making the feed of the fuel and water dependent upon the feed of the air so that the flow of all three of these ingredients would vary together, and that this principle could be utilized, as appellee has utilized it, by causing the air to act directly upon the fuel and water, just as well as by causing the air to act indirectly upon them through the intermediacy of a pump and a regulator, as is illustrated

in the Davison patent. This is made clear by the language of the patent.

This difference between appellee's and the Davison constructions is, therefore, a difference which has no bearing whatever upon the issues of this suit. It involves nothing more than the use, in the Davison construction, of an additional piece of mechanism to attain certain definite and additional advantages which are not attained with appellee's construction and to which the claims of the patent relied on in this suit are not limited.

A licensee is estopped from denying the validity of the patent covered by his license, and this is just as true when the licensee is the United States as when the licensee is an individual. *Harvey Steel Co.* v. *United States,* 196 U. S. 312.

But the principle goes further. The licensee is estopped from reading into a plain and unambiguous claim some element not actually present there, and from relying upon the prior art in support of a contention that such a construction of the claim is necessary. If a claim could be given some strained meaning and limited scope, out of all harmony with the usual and accepted meaning of the words employed and with the description of the invention contained in the specification, then the whole effect of the rule that the claim must be assumed to be valid because of the license, would be frustrated. *Eclipse Bicycle Co.* v. *Farrow,* 199 U. S. 581; *Siemens-Halske Elec. Co.* v. *Duncan Elec. Mfg. Co.,* 142 Fed. 157; *Chicago & A. Ry. Co.* v. *Pressed Steel Car Co.,* 243 Fed. 883; *National Recording Safe Co.* v. *International Safe Co.,* 158 Fed. 824; *United Printing Machinery Co.* v. *Cross Paper Feeder Co.,* 227 Fed. 600; *Leader Plow Co.* v. *Bridgewater Plow Co.,* 237 Fed. 376; *U. S. Frumentum Co.* v. *Lauhoff,* 216 Fed. 610.

So admission of the prior art on the ground that its examination is justified in order to fix the scope of the pat-

ent in suit (unless the claims of the patent are, on their
face, ambiguous) is, in its practical effect, equivalent to re-
leasing the defendant from the estoppel arising by reason
of being a licensee under the patent or having assigned the
patent to the plaintiff.

· Refusal to examine and consider such extraneous evi-
dence as the prior patents accompanying the findings
would be particularly appropriate in this case in view of
the special facts incident to the execution of the license.

In view of the simple facts and the plain language of
the license agreement, the meaning of the agreement, what
the parties intended to cover by it and what they actually
did cover, are clear beyond the possibility of dispute. The
thing which appellee was licensed to manufacture is ex-
plicitly defined, without ambiguity, at three places in the
contract.

The correspondence leading up to the contract shows
that a contract of just that meaning is just what the par-
ties to the contract intended. Furthermore, that the
parties understood that the Bliss torpedo was within the
license covered by the contract is plainly indicated, for it
was the only torpedo then in existence which had run
a long range, the contract was solicited by the Department
immediately after it had run the long range, the Depart-
ment's attention was called to the fact that the Davison
torpedo was " presumably similar to devices made by
other companies," and that the Bliss torpedo was a water
injection torpedo made by " proceeding along the same
lines " as Davison, and, as soon as the license was in a
form approved by both parties, the Department pro-
ceeded to order 50 torpedoes like the one which ran 10,000
yards on the test.

A representative of the Navy Department was informed
of Davison's invention and urged him to develop it.
Later, after much correspondence and negotiation, the
Navy Department contracted with appellant and another

company for the manufacture of experimental torpedoes by them, and, as soon as the first of these experimental torpedoes was completed and tested, and its success in attaining a long range demonstrated, the license agreement now before the Court was negotiated and executed.

Throughout all of these proceedings, negotiations and correspondence, the Davison invention was referred to as the "Steam Generator for Automobile Torpedoes," and that was an entirely sufficient designation for it, because no such thing had been used before, and that term served adequately to differentiate from the superheater which had been in common use for years. The purpose of the license agreement was to secure to appellee the right to use the steam generator devised by Davison, regardless of any question either as to the validity of patents he might obtain or as to the scope of their claims. Appellee was not concerned with any such matters, and that is why it did not think it necessary to examine the Davison applications then pending in the Patent Office and in fact did not do so.

The invention was not anticipated in the prior art.

*Mr. Harry E. Knight,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck, Mr. Assistant Attorney General Lovett* and *Mr. L. G. Miller,* Special Assistant to the Attorney General, were on the brief, for the United States.

1. Since the court below, on the basis of all the evidence, has found as a fact that the defendant has not used plaintiff's device or invention, its conclusion that the plaintiff cannot recover presents no question of law the determination of which can lead to reversal.

2. The contract was for a definite physical thing—the Davison "Steam Generator for Automobile Torpedoes"—identified by and known to the Government only through a drawing or blue print. This device the Govern-

ment has not used, but instead it has used a device radically different in construction and operation, which device was made by the Bliss Company for the Government before the contract in question was made or was even suggested. *Harvey Steel Co.* v. *United States,* 196 U. S. 310; 38 Ct. Clms. 662; 39 Ct. Clms. 297.

3. The contract, in referring to a device covered by a patent application then pending in the Patent Office and not fixed in the form of a patent, and more especially since the content and tenor of the application was not considered by the parties, can be held at the most only to relate to what the parties could reasonably have expected to be patented; that is, to the actual novelty in the disclosure of that patent application, irrespective of the form of the claims which the Patent Office subsequently permitted in the patent document. *Eclipse Bicycle Co.* v. *Farrow,* 199 U. S. 581. In the present instance the Government utilizes devices not novel with plaintiff's assignor, Davison, but actual embodiments of inventions of the prior art which existed not only in the form of printed publications before the date of his invention, but which actually existed in the form of a completed torpedo built by the Bliss Company and successfully tested under Government supervision long before the contract was signed and even before negotiations leading to the contract were begun.

4. The patent in suit can not include and cover what was known to the public through a printed publication before the data of the patentee's invention and which the Government uses; and in fact it does not in its terms cover this.

Mr. Justice Holmes delivered the opinion of the Court.

This is a suit upon a contract made between the claimant and the United States on April 2, 1912. The contract,

headed " Shop License," recites that the claimant is
" owner of the invention known as Steam Generator for
Automobile Torpedoes covered by applications," of which
it is necessary to mention only one, dated March 29, 1909;
licenses the United States to manufacture and use tor-
pedoes equipped with Steam Generators covered by the
application to the end of the term for which patent may
be granted; and binds the United States to pay at certain
rates for such torpedoes. The claimant alleged that the
United States had used the devices covered by claims 1, 5
and 13 of letters patent issued upon the above application
on August 20, 1912. The Court of Claims found that
those devices had not been used by the United States, but
that the mechanism actually used by it was practically
identical with that of a rival, the E. W. Bliss Company,
that had been successfully tested in the fall of 1911, be-
fore the date of the above contract and before the plaintiff
had attempted but failed to satisfy the same tests.

When this contract was made the United States had not
seen the applications, which were the claimant's secret.
Both parties knew that the Government was dealing also
with a rival concern, and the United States, at least, and
probably the claimant, knew that the rival had satisfied
the Government's tests, which the claimant had not then
done. It could not be believed that the contract meant a
blind acceptance of liability for whatever might be in an
undisclosed document. It did not; what it aimed at was a
specific device which it was given to understand had been
invented. We do not argue this at length because the
proposition is accepted by the claimant—" the purpose of
the license agreement was to secure to appellee the right
to use the steam generator devised by Davison, regardless
of any question as to the validity of patents he might ob-
tain or as to the scope of their claims." The dealings
began with proposals for applying a system to existing
torpedoes that would double their range, illustrated by a

drawing showing the general arrangement of the device, identifying it but not disclosing it in detail. They ended in the contract, which went further, but undoubtedly had reference to a system the general nature of which was understood.

We must take it on this record that, at the time, certain elements in the construction of self-moving torpedoes were well known. The front end contained the explosive. Behind that was a chamber of compressed air that was transmitted to an engine moving the propeller through a pipe with a valve that reduced the pressure of the condensed air to the desired point and kept it constant The moving force was enhanced by heating the air after it left the valve. This was done by passing it through a combustion chamber into which was forced alcohol or other fuel. The fuel was in a third chamber and was carried to the place of combustion by the condensed air through a second pipe from beyond the reducing valve. It was ignited when the shell was launched. More was needed to carry the torpedo the distance required to make it usable in modern warfare. It was understood that the result could be accomplished and danger to the contrivance from excessive heat avoided by the introduction of water into the combustion chamber where it would become steam. The Bliss Company had given this knowledge a practical form, and there is no warrant in the record as it comes to us for suggesting that the claimant had anything to do with the Bliss Company's success, or that the Government had any reason for thinking that it had. In deciding what the Government reasonably supposed that it was buying, these facts are important, and what may have been contained in the undisclosed application is of little or no weight. Whatever may have been the rights of the claimant as against the Bliss Company, the Government was entitled to assume that they did not extend to the above elements, separately or combined.

Manifestly, on these facts, the Government is not estopped to show that its contract applied only within narrow limits. If the facts were as it had a right to suppose them to be, the contract necessarily was so limited. The Government thought that it might be that the claimant had found a more perfect way to do what was wanted and what the Bliss Company already had done, but, on the record before us, it would be monstrous to suppose that it was undertaking to pay the claimant for the Bliss Company product. The claimant was thought by the Government to have failed in its undertaking, and therefore its device was laid aside. That device had certain peculiarities not repeated by the Bliss Company's, but the claimant relies and has to rely here upon the broad contention that the introduction of water to the combustion chamber in an effective way belongs to it, which seems unlikely in view of the previous British patent to Sodeau, in 1907, and others, and which it seems to us clearly might have been found, as by implication it was found, by the Court of Claims, not to have been the assumption or the meaning of the contract. So far as appears, the use of water by the Bliss Company owed nothing to Davison, the claimant's assignor, but very closely embodied the suggestions of Sodeau and other predecessors in the field. We cannot say as matter of law that the Court of Claims was wrong.

*Decree affirmed.*