Littleton, Judge,
delivered the opinion:
The first point is whether the contract of January 1, 1920, was susceptible of breach by the defendant. The defendant insists that it was not, for if the agreement could be construed as obligating the defendant to give plaintiff any orders for torpedoes it was so indefinite as to the consideration, number, plans and specifications, and the time of manufacture as to render it fatally defective and unenforceable, and amounted to nothing more than an agreement to make an *43 agreement. We are of opinion that this contention is without merit. Central Trust Co., etc., v. Wabash, St. Louis & P. Ry. Co. et al., 29 Fed. 546; Joy v. St. Louis, 138 U. S. 1; United States v. Berdan Fire-Arms Mfg. Co., 156 U. S. 552, 569; United States v. Swift & Co., 270 U. S. 124; United States v. Wilkins, 6 Wheat. 135; Williston on Contracts, Sec. 38. We have considered the several State decisions and the English case of Connery v. Best, Saxby & Co., 1 Cab. and El. 291, relied upon by defendant to the effect that a preliminary agreement to make such a contract as the parties may later agree upon is incomplete and unenforceable. We think the cases cited by the defendant in support of its position are not in point here. The consideration for the contract in question moving from plaintiff to the defendant was the right conferred upon the Government to use plaintiff’s patents in the manufacture of Bliss-Leavitt torpedoes. The purposes of the contract were definite. The durátion was expressly described as twenty years. The right moving to the Government was the privilege of manufacturing a number of said torpedoes equal to the number for which orders or contracts to manufacture should be given by the Government to the Bliss Company and therefore the total number was to be determined by the Government itself. The defendant was not obligated to give plaintiff orders or contracts for torpedoes unless the Government decided to manufacture them and if the Government had manufactured no Bliss-Leavitt standard torpedoes, the plaintiff would have no cause for complaint. The time of payment was expressly described in the contract; namely, settlements to be annually as of December 31. The method of settlement was expressly described; namely, by checking the number of torpedoes manufactured by the Government against the number ordered from the plaintiff with provision as to detail so that there could be no duplication. Provision was expressly made for an increase in the payment over the $75 per torpedo in the event of a larger number of torpedoes being manufactured (subparagraph (a), paragraph 3 of the contract) and also if any patents were obtained by the Bliss Company, and for a decrease of the royalties if existing patents should expire. Provision was also made for the plaintiff to in *44 ■demnify the Government against any infringement suits occasioned through the use of plaintiff’s patents.
The time and place of delivery were:not prescribed, but the .presumption of reasonableness and Government direction would apply to both of these. The amount to be paid by the Government for each torpédo was not prescribed,' but in the absence of a definite provision as to' this a reasonable compensation would be-assumed."- The reason-the amount’to-be paid for each’ torpedo was not and could hot be fixed at the time the contract was-entefed into is obvious. It was’made •almost immediately • after the war when conditions were abnormal and prices fictitious. -’-It was to 'continúe for twenty - years-.’ ■ On questions of royalty' to be paid under certain circumstances it was easy to’fix the amounts, but that did hot depehd upon cost óf laboi-and materials. ’ When it came to fixing prices on the torpedo itself, which involved a guess of what the trend-of -prices of- labor and materials’’would be for twenty year's to come, -it will at once- be seeh that'it was unreasonable-to attempt to do-Other’ than-the patties did; namely, to leave that-to be determined-when, the torpedoes were required by the Government ’and the Orders therefor given, or, in the failure to’ agree at that time, to be fixed at a reasonable' amount: In adopting this course, the parties followed the- method ’ which, as appears from' the evidence and the preamble to the contract, had been followed ■by them for a number of years past. We’ can’ see that' it might be an unwise -policy for a Government department to éntef into a contract' extending over a period- of' twenty years which fixed the price, -place of’ delivery, and quantity for the entire -twenty’years.' Conditions affecting each Of these matters necessarily vary from time to -time and only by means of such á contract as was executed in this casé could ■the Government secure to itself for an extended period of time the valuable and important privilege of using the •plaintiff’s patents in the manufacture of the Bliss-Leavitt standard torpedo. This was the purpose of the contract and was a prudent way of securing the privilege, and public policy is in favor'of the Government’s being able to secure the use of important inventions by means of prudent contracts.
• The next question is whether the contract obligated the defendant if it desired to manufacture Bliss-Leavitt standard *45 torpedoes to give the plaintiff orders or contracts for a number of torpedoes equal to the number which the defendant desired to manufacture, or whether, on the other hand, the defendant had the right under the contract to itself manufacture its full requirement of torpedoes upon the payment to plaintiff of $500, or less, under paragraphs 3 (a) and (b) without giving the plaintiff an order or contract for any torpedoes.
The defendant insists that the contract did not obligate it to give plaintiff orders or contracts for torpedoes, and that if the defendant manufactured Bliss-Leavitt torpedoes without giving such orders or contracts, it was obligated only to pay plaintiff $500 for each such torpedo manufactured under subdivision -(b) of section 3 of the contract; that the contract was nothing more than a license agreement giving, the Government the right to manufacture as many torpedoes as it might desire upon payment to plaintiff of $500 per torpedo. ; The defendant therefore states the question to be simply whether 1,006 torpedoes manufactured by the defendant exceed none. We are of opinion that this construction of the contract is not warranted when the contract is considered as a whole. We may not ignore other provisions of the contract and consider only subdivision (b) of paragraph 3. That subdivision goes no farther than to provide a basis for final settlement on December 31 of each year by checking the total number of torpedoes manufactured by the defendant against ■the number for which orders or contracts had been placed with the plaintiff as provided in section 3. Subdivision (b) had no effect independently of section 3 and was operative ■only on condition that orders had been placed with the plaintiff. By. the plain terms of the contract the parties agreed the plaintiff would be given a contract or contracts for one-half of the Government's annual requirements for torpedoes. Section 3 which provides that “The department’shall have the right to manufacture * * * a number of Bliss-Leavitt torpedoes equal to the number manufactured by the E. W. Bliss Company, and in determining this number the number manufactured by the Bliss Company shall'be considered to be that number for which contracts shall, after (this date) December 24, 1918, be entered into between the *46 company and the department,” is susceptible, we think, of no other interpretation. Under subdivisions (a) and (b) there are provisos to the effect, first, that if the Government’s requirement exceeds 1,000 torpedoes and the amount the Government is entitled to manufacture, and does manufacture, exceeds 500 the Government should pay to the Bliss Company the amount of $400 for each torpedo of the first 500 of such excess, $350 for each torpedo of the second 500 of such excess, and so on by successive decreases of $50 for each additional increment of 500 torpedoes manufactured by the defendant — such royalty never to be less than $75 per torpedo plus 10 per cent; secondly, that an accounting should be had on December 31 of each year beginning with December 31, 1919, and the operations for that year completely settled and adjusted, and if it should be found upon checking the number of torpedoes for which orders had been given the Bliss Company against the number manufactured by the Government during that year, irrespective of the number under contract and the number manufactured by the defendant, that the number exceeded the total number of torpedoes for which contract had been placed with the Bliss Company during that year, in accordance with sections 2 and 3 of the contract, a royalty of $500 would be payable to plaintiff for each such torpedo in excess of the number ordered from the Bliss Company.
It was further provided that in the event of payments being effected upon such accounting, they should supersede those payments specified in subdivision (a) of section 3 of the contract. In other words, under subdivision (a), section 3, if the Navy Department in any year decided that it needed more than 1,000 torpedoes it could manufacture 500 torpedoes free of all payment to the plaintiff except $75 each, but any number manufactured by the defendant in excess of 500 would require a payment to the plaintiff of $400 for each torpedo of the first 500 of such excess with a diminishing amount per torpedo for the second 500 of such excess, and so on notwithstanding orders or contracts for one-half of the torpedo requirements had been given plaintiff. But this subdivision did not give the defendant the right to manufacture any number of torpedoes upon the payments mentioned therein where no orders or contracts had been *47 placed with the plaintiff. Likewise, the $500 per torpedo specified in subdivision (b) of section 3 was inserted as a convenient- means of settling and adjusting the accounts between the plaintiff and the defendant at the end of each year without carrying the dispute or variance between the number of torpedoes ordered from plaintiff and the number manufactured by the defendant over into the next year. It was recognized that there was likely to be a variance between the number of torpedoes ordered from the plaintiff and the number which the defendant might manufacture during each year of the life of the contract, and this proviso was inserted as the basis for an immediate and convenient adjustment of unsettled accounts between the department and the company at the end of each year. This interpretation of subdivision (b) of section 3 is fully borne out by the long-pending unsettled account between the department and the Government growing out of the manufacture by the Government over a period of years of torpedoes covered by patents owned and controlled by the Bliss Company. The parties recognized the advisability of having all transactions completed and finally adjusted and settled on an annual basis, and this was the only purpose of subdivision (b). It did not reheve the defendant of its obligation to give the plaintiff orders or contracts under section 3 as a condition to its right to manufacture any torpedoes- during any year. Neither did it relieve the defendant from further liability upon the payment of $500 for torpedoes where no torpedoes had been ordered from the plaintiff. The payment by the defendant of $500 per torpedo was neither a waiver of nor compensation for its breach of the agreement to place with the plaintiff orders to manufacture one-half of the Government’s requirement for torpedoes. Had the intention of the parties been that the payment of a royalty of $500 should be in satisfaction and absolute discharge of the obligation of the Govern-, ment the contract would never have taken the form in which it was executed. Only a simple contract to the effect that for twenty years the Government might make as many Bliss-Leavitt torpedoes as it required upon payment to the Bliss Company of $500 for each torpedo would have been entirely sufficient.
*48 There would have been no provision as to giving contracts to the plaintiff; there' would have been no provision for limiting the royalty to an excess over orders; there would have been no basis for the provision based on settlements on a checking against “torpedoes contracted for with the Bliss Company,” or for delivery of torpedoes by the plaintiff; there would have been no occasion for imposing secrecy in manufacture on the plaintiff.
The defendant called certain witnesses, who were officers of the Navy Department at the time the contract in question was made, who testified that their understanding was that the Government was obtaining from the Bliss Company a license to manufacture torpedoes in the Government navy yards. The contract did give the Government that right but it was more than a license to the Government to manufacture its full requirement of torpedoes upon the payment of $500 each. The language of the contract and the great preponderence of the evidence justifies the construction which we have given to this phase of the contract.
The acceptance by plaintiff of the amounts tendered by the defendant as shown by the vouchers set forth in the findings did not estop the plaintiff from insisting upon performance of the contract and, in the light of the facts, did not evidence the fact that plaintiff construed these payments as being in full and complete satisfaction of the defendant’s liability thereunder. These vouchers, which were prepared by the Government, recognized the validity of the contract in question and the certificates thereon which the plaintiff signed were prepared by the defendant. Plaintiff’s officers protested all along that these payments did not relieve the defendant from placing with it orders for torpedoes, and the facts establish that early in the history of the relation of the parties under the contract of January 1, 1920, the plaintiff was led to believe that the department would give it orders for torpedoes so as to adjust the matter in accordance with the contract. The plaintiff at all times insisted that this should be done, and when the Secretary of the Navy finally held, in 1925, that the Government could manufacture any number of torpedoes that it might require and was not obligated under the contract to give the plaintiff any orders *49 or contracts for torpedoes, the plaintiff refused further payments of $500 per torpedo by the defendant.
The torpedoes manufactured by the defendant were covered by a large number of patents owned by plaintiff applying to practically all of the vital portions of the torpedo and the plaintiff’s investment in its torpedo department, exclusive of its investment in the Sag Harbor testing plant, until 1923 was $7,314,360. In 1923 certain torpedo-manufacturing equipment was disposed of, leaving an investment in the torpedo-manufacturing plant alone of $5,225,900. The annual cost to the plaintiff for the upkeep and maintenance of its torpedo-manufacturing department and its Sag Harbor testing plant during the period here involved, including depreciation, was not less than $397,347. A consideration of these facts, together with the highly specialized nature of the torpedo and the plant for its manufacture, the limited field in which it could be sold in the fight of the language of the contract in question and the relations of the parties, entirely overcomes in our opinion the contention of the defendant that the plaintiff by the contract of January 1, 1920, gave the defendant the privilege to manufacture for twenty years its full requirement for torpedoes upon the payment of a royalty of $500 each. Cf. Electric Boat Co. v. United States, 57 C. Cls. 497, 263 U. S. 621, where the defendant considered a royalty much in excess of $500 reasonable for the privilege of using one device covered by a patent in the manufacture of torpedoes, which royalty, it was held, the Government was not compelled to pay to the plaintiff, in that case, because the mechanism actually used by the defendant was practically identical with that of the E. W. Bliss Company that had been successfully tested in 1911 before the date of the license contract and before plaintiff had attempted but failed to satisfy the same tests.
The defendant next contends that under the statutes in force on and after January 1, 1920, the Secretary of the Navy was without authority to enter into the contract in question for the manufacture of torpedoes which could be manufactured in the Government navy yards for a sum less than they could be purchased or otherwise acquired, and in support of this contention relies upon the provisions of the appropriation *50 act of July 11, 1919, 41 Stat. 131, 157, and subsequent naval appropriation acts for each year up to and including the act of January 22, 1923, 42 Stat. 1132, 1154; tbe naval appropriation act of May 28, 1924, 43 Stat. 182, 205, and the naval appropriation acts of February 11, 1925, and May 21, 1926, 43 Stat. 861, 881, and 44 Stat. 591, 613, respectively. The statutes prior to the act of May 28, 1924, sufra, provided that no part of the monies therein appropriated could be used or expended for the purchase or acquirement of any article or articles that at the time of the proposed acquirement, could be manufactured or produced in each or any of the Government navy yards of the United States, when time and facilities permitted, for a sum less than it could be purchased or otherwise acquired. The naval appropriation act of May 28, 1924, supra, contained the provision that “ * * * no part of the moneys herein appropriated for the Naval Establishment or herein made available therefor shall be used or expended under contracts hereafter made for the repair, purchase, or acquirement by or from any private contractor, of any naval vessel, machinery, article, or articles that at the time of the proposed repair, purchase, or acquirement, can be repaired, manufactured, or produced in each or any of the Government navy yards or arsenals of the United States, when time and facilities permit, and when, in the judgment of the Secretary of the Navy, such repair, purchase, acquirement, or production, would not involve an appreciable increase in cost to the Government.” We are of opinion that the aforementioned provisions in the appropriation acts can not be held to apply and were not intended to limit the authority of the Secretary of the Navy to enter into contracts for an article or articles fully protected by United States patents which the Navy Department was not free to manufacture without becoming liable upon a suit for infringement for full and entire compensation under the act of June 25, 1910, 36 Stat. 851, as amended by the act of July 1, 1918, 40 Stat. 704, 705. There is no evidence in this record, nor is there any suggestion by the defendant, that the cost at which the Government could manufacture the Bliss-Leavitt torpedoes in its own navy yards plus full and entire compensation to the plaintiff for the use of its several patents was *51 less than they could be purchased or acquired from the plaintiff. Although the Government was able to manufacture the' torpedoes in question at a cost which was less than the amount for which it could acquire them from the plaintiff, it was not free to do so without becoming liable for full and entire compensation to plaintiff for infringement of its patents. The defendant admits that it was not free to use the Bliss-Leavitt patents in the manufacture of torpedoes in its own navy yards without permission of the plaintiff and it relies in support of its position on this point upon its construction that the contract- of January 1, 1920, gave the Government the right to manufacture as many torpedoes as it desired upon the payment of $500 each. It insists, therefore, that the Secretary of the Navy had full authority under the various appropriation acts mentioned to enter into an agreement with the plaintiff for the use of its patents. But we have held that the agreement of January 1, 1920, was more than a license to the Government to manufacture its full requirement of torpedoes upon payment of $500 each. We think the Secretary of the Navy had authority to make the contract in question and was not prohibited from doing so by the provisions contained in the appropriation acts mentioned.
The next question is whether the amount which the plaintiff is entitled to recover should be computed upon the basis of a reasonable profit for the entire number of 1,006 torpedoes manufactured by the defendant during the period involved, or upon one-half of that number, or 503 torpedoes.
Plaintiff insists that the contract required the defendant to give it orders for a number of torpedoes equal to the number which the defendant might manufacture, and that since the defendant has manufactured 1,006 and gave it no orders it is entitled to recover a reasonable profit upon this number.In this we are of opinion that the plaintiff is in error. As hereinbefore pointed out, the contract contemplated that the Government should have the right to manufacture each year' one-half of its total requirement for torpedoes free of all payment to the plaintiff except a royalty of $75 on each torpedo, except that if, at the end of the year, it should be found that the Government had manufactured more than its pro *52 portion of torpedoes it would pay to the plaintiff $500 per torpedo in excess of the number which had been estimated to be one-half of the number required by the Government during that year, for which orders or contracts had been placed with the plaintiff. It is therefore manifest that had the contract of January 1, 1920, been carried out according to its terms the plaintiff would have been entitled to orders for 503 torpedoes and no more. Its recovery therefore must, be limited to a reasonable profit upon this number of torpedoes.
The next question is the amount which the plaintiff is entitled to recover. The evidence establishes, and we have found as a fact, that a profit to the plaintiff of 23.2% of the cost of each torpedo is under all the circumstances fair and reasonable. In arriving at this figure we have carefully considered the testimony of a number of witnesses qualified to testify with reference to this matter who were called by the plaintiff on this point. The average percentage of profit per torpedo fixed by these witnesses was 43.4%. Upon the basis of this testimony and the profit made by the plaintiff during 1924 in the manufacture of torpedoes for the governments of Peru, Argentina, and Brazil, plaintiff insists that it should be given judgment on the basis of an average profit of 39.4%. We can not wholly agree with the opinions expressed by plaintiff’s witnesses. The Conqueror, 166 U. S. 110. From plaintiff’s actual experience during the year 1924 in the manufacture of 109 torpedoes and the fact that it was relieved from the care, trouble, risk, and responsibility attending the manufacture of said torpedoes or any of the four thousand parts of each torpedo, we conclude that a profit of 23.2% is reasonable.
The defendant called no witnesses on the question of a reasonable profit, nor did it attempt to controvert the actual net profit realized by plaintiff on sales of torpedoes during the year 1924. Counsel for the defendant, however, offered two letters written in 1919 and in 1924 by plaintiff to the Navy Department with reference to some of the torpedoes manufactured by plaintiff under some of the contracts with the Government. An examination of these letters and the facts surrounding them show that nothing therein contained affords a proper basis for arriving at a reasonable profit to *53 plaintiff for the manufacture of torpedoes during the period here in'question and under entirely different circumstances. As to one of the letters written in. 1919, it-appears that during the war, under direction 'of the Government, plaintiff was obligated to pay .persons working on torpedoes a higher per diem wage than had theretofore been paid, and the letter'was written for the purpose of .showing the increased, cost to plaintiff for making torpedoes - by reason of such increase in wages paid after the contract had been entered into and as a result of an estimate eliminating from consideration allowance for parts not- supplied,- etc. The purpose of this letter was to induce the Government, if possible, to reimburse the plaintiff for the additional wages-paid. The work was then ■being done under such-conditions as to .make the .profits on the torpedoes then being manufactured very problematical. These condition's and the calculation referred to in; the letter did not cover the entire period covered by the contracts nor all of the torpedoes being manufactured thereunder, but covered only an arbitrary period of twenty-five weeks from September 2, 1918;'to February 22, 1919. .
Another letter, written in 1924, arose out of the controversy covered by paragraph, 5 of the contract of January 1-,T920, here in.question with-reference to a:provision that if during -the continuance of the contract any of the plaintiff’s patents lapsed, a board should be appointed to determine whether the expiration of such patents should reduce the;amount-of $500 prescribed by subdivision-,(b) of-paragraph. 3 of the contract.- - Such , a board was appointed, and -this letter was ■written by plaintiff in- support of its contention that there should be no reduction in the. amount payable under this subdivision. In the course of this letter plaintiff stated that its profits on contracts entered into between. 1914 and 1918 had been practically wiped .out because of extraordinary conditions existing during the war; that the reason-for-this was the increase in cost of labor and materials and that its buildings and equipment for torpedo manufacture had been idle for a long time prior to the date of the letter and had depreciated in value; that some of its torpedo equipment installed during the war period to meet the needs of the Government for torpedoes had been sold at prices much below its depreciated cost; and that the losses in these ways had wiped out *54 most of the profit which otherwise would have been made. The prior contracts referred to by these two letters fixed the price to be paid for the manufactured torpedo. In one case, as the result of abnormal conditions then existing, the manufacturing profit realized by plaintiff was seriously diminished ; in the other case, a fixed-price contract, the profits possible of realization by the company were largely wiped out by depreciation of property and equipment devoted to the manufacture of torpedoes. These letters afford no real basis for the determination of a reasonable profit to the plaintiff during the period in question here upon the agreed cost of manufacture unaffected by any of the conditions or circumstances that affected the plaintiff’s profit upon torpedoes manufactured under contracts entered into prior to and during the period of the war.
We find no merit in the claim of plaintiff for $1,878,682.85 damages by reason of idle plants. There is nothing in the contract in suit obligating the Government to reimburse plaintiff for the cost of maintaining its torpedo and testing plants during the time they might remain idle, and there is nothing to show that this was within the contemplation of the parties. Plaintiff had a large and expensive plant with a capacity of twelve torpedoes per day. As hereinbefore pointed out, if the Government’s requirement did not call for any Bliss-Leavitt torpedoes it was not obligated to place any orders with the plaintiff or to pay it any amount whatsoever. Only when the Government desired Bliss-Leavitt torpedoes or manufactured the same in its navy yards would the defendant become obligated to pay the plaintiff therefor. Labor and overhead have been included in the cost of the torpedoes in arriving at the amount which plaintiff is entitled to recover on the basis of a reasonable profit on such cost. It is entitled to no greater amount as special damages for the defendant’s failure to give it orders or contracts for one-half of its torpedo requirements during the period in question. Judgment will be entered in favor of plaintiff for $556,677.38. It is so ordered.
Williams, Judge; Green, Judge; and Booth, Chief Justice, concur.
Whaley, Judge, took no part in this decision, he having heard the case while commissioner of the court.